[No. B116276. Second Dist., Div. Four. Sept. 15, 1999.]

ERNEST AUERBACH et al., Plaintiffs and Respondents, v.
GREAT WESTERN BANK, Defendant and Appellant.

1174

## COUNSEL

Morrison & Foerster, Shirley M. Hufstedler; Ivanjack & Lambirth and Timothy A. Lambirth for Defendant and Appellant.

Mandel & Norwood, S. Jerome Mandel and Lily Lewis for Plaintiffs and Respondents.

## OPINION

**CURRY, J.**—In a suit that raises several issues concerning the type of out-of-pocket expenses which will suffice to support fraud damages, respondents Ernest and Lisa Auerbach (the Auerbachs) brought suit against appellant Great Western Bank (GW) claiming that it fraudulently promised to negotiate a modification to an existing loan agreement in order to induce them to continue to make payments on the loan. Because we conclude that the Auerbachs are incorrect in their assumption that an existing nonrecourse agreement precluded GW from pursuing them individually if they defaulted on the note, we reduce the portion of the fraud award which represents payments made to GW on the preexisting note and remand for recalculation of punitive damages based on the award as modified. The Auerbachs also pursued a breach of contract claim against GW, but the damages awarded are not supported by the evidence, and we therefore reverse the breach of contract award.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### The Original Loan

The Auerbachs are real estate investors who own a sizable portfolio of properties. In April of 1988, they borrowed $2 million from GW to finance

---

[1] In accordance with applicable legal standards, we take as true the facts which favor the jury's verdict. Unless otherwise indicated, the facts related are taken directly from the testimony and documentary evidence presented at trial by respondents.

the purchase of a piece of commercial real estate located in San Diego which was, at the time, owned by GW as an "REO."[2] The Auerbachs executed a promissory note secured by a first trust deed, and the parties entered into a nonrecourse agreement. The property was conveyed to respondent Auerbach Family Trust of 1987 (the Family Trust) without GW's knowledge or consent sometime after the sale was consummated.[3] (The Auerbachs and the Family Trust are hereafter jointly referred to as respondents.)

The promissory note contained a due on sale provision which allowed GW to accelerate the note if it were transferred unless GW consented and certain conditions were met, including payment of a 1 percent transfer fee. In addition, the note contained the following nonstandard provision: "Notwithstanding any of the foregoing, the undersigned will be permitted to transfer the property two times, without an acceleration of the loan or a transfer fee being paid; provided however, that the undersigned maintains a 51.00% interest in the property as an individual or as a Trustee of Auerbach Family Trust of 1987, to The Auerbach Family Trust of 1987 and/or nominee. The transfer shall be further subject to approval in writing by the Bank using the Bank's underwriting criteria in effect at the date of transfer and the transferee must execute Holder's assumption documentation to evidence the assumption of the loan obligations."

The nonrecourse agreement insulated the Auerbachs from personal liability in the event of default. By its terms, it applied "only to the Borrower named above [the Auerbachs] and not to any direct or subsequent transferees of the Secured Property." It further provided that it would "terminate upon sale, transfer or other conveyance of all or any part of Borrower's interest in the Secured Property."

The property produced sufficient income to turn a modest profit from 1988 through 1992. Thereafter, the existing lease expired and the Auerbachs were unable to find a new tenant willing to pay sufficient rent to cover expenses. In addition, the property's market value declined steeply.[4] In December of 1992, the Auerbachs, through the president of their real estate

---

[2] "REO" stands for "real estate owned" and means a property the bank acquired through foreclosure.

[3] As is discussed below, it might be more accurate to say that all property owned by the Auerbachs was automatically put into the Family Trust by the Auerbachs' estate planning attorneys through the use of blank deeds the Auerbachs had presigned.

[4] The fair market value of the property was variously appraised at: $1,350,000 to $1,450,000 in April 1993 by the appraiser hired by GW; $1,250,000 in July of 1993 by the San Diego County Assessor's Office; $1,060,000 in July of 1994 by the San Diego County Assessor's Office; $1,050,000 in August of 1994 by the appraiser hired by GW; and $1.6 million by Jason Abt, an assistant vice-president of GW, in October 1994.

investment company, Mark Ross,[5] sought to discuss renegotiating the debt. After contacting GW, Ross was informed by Mark Rasmussen, a vice-president in the major loan adjustments department for GW, that before the bank could consider a loan modification, the parties would have to sign a preworkout agreement.

In anticipation of negotiating a workout, the Auerbachs had not made the payment due for January under the note. GW sent notice of intention to foreclose. In a meeting held on February 9, 1993, Rasmussen told Ross that if the Auerbachs wanted to negotiate modification of the loan, they needed to make the January payment and get the preworkout agreement signed.

### The Preworkout Agreement

In February of 1993, a few days after the meeting, the parties executed the preworkout agreement.[6] In its preliminary recitals, the agreement stated: "Borrower desires to enter into negotiations with Lender to discuss the possibility of modifying the Loan Documents in order to, among other things, adjust the payment terms of the Note" and that "Lender is willing to enter into negotiations to discuss with Borrower the possibility of modifying the Loan Documents pursuant to the following terms and conditions."

Under the heading "Agreement" the document further stated: "Borrower and Lender will commence negotiations concerning the possible modification of the obligations . . . owed to Lender by Borrower relating to the Loan and will discuss various courses of action that the parties hereto believe might be in their mutual interest. Efforts by Borrower or Lender to negotiate, prepare a contract or complete due diligence shall not be considered as evidence of intent to be bound to modifying Borrower's Obligations. Neither this Agreement nor Lender's performance under this Agreement shall constitute a waiver by Lender of any default by Borrower that may now or hereafter exist under the Loan Documents."

Paragraph 2 provided in pertinent part: "This Agreement shall confirm that while there may be many matters that the Borrower and Lender may discuss, no agreements reached on any point shall have any effect whatsoever unless and except to the extent that the same shall have been reduced to writing, executed by the parties, with such executions being duly authorized and delivered between the parties. Borrower acknowledges that due authorization by Lender may include (a) approval by the Vice President of Service

---

[5] Ross was also, through an arrangement with the Auerbachs, the holder of an 11.25 percent interest in the property. He performed all the negotiations which led up to the lawsuit. The Auerbachs themselves never met with anyone from GW.

[6] The preworkout agreement is sometimes referred to by the parties as the "PwA." It is dated effective January of 1993.

Operations of Lender, (b) approval by the Senior Vice President of Service Operations of Lender, (c) approval by the Executive Vice President of Real Estate of Lender, (d) approval by Lender's Investment Committee, and (e) review and approval by In-House Counsel for Lender. . . . By executing this Agreement, Borrower is precluded from claiming that there has been any interim agreement or modification of the Loan Documents, except in accordance with the specific terms hereof, regardless of any acceptance by Lender from Borrower of any payments or partial payments or any other performance that is not in strict accordance with the Loan Documents."

Paragraph 4 made clear that until modification, "Lender shall not be deemed to have waived its right to demand full payment of principal, interest and any and all other amounts due in accordance with the strict terms of the Loan Documents, as those payments become due." Paragraph 13 left intact GW's right "to take any and all steps preparatory to the non-judicial or judicial foreclosure of Borrower's interest in the Property."

Under paragraph 11, the Auerbachs bound themselves to pay all reasonable costs and incidental expenses incurred by GW "related to the modification of the Loan Documents" including any appraisal and attorney fees.

At the February 9 meeting, Rasmussen informed Ross of various ways in which workouts had been structured by GW in the past. This discussion became the basis for the various proposals advanced by Ross on behalf of the Auerbachs discussed below.

*The Auerbachs' Proposals and GW's Responses*

In February of 1993, Ross submitted a proposal to reduce debt service payments to $6,000 from $15,000 for one year based on the then current cash flow. GW sent a letter stating that it was going to have the property appraised. In addition, Rasmussen called Ross and orally rejected the cash flow proposal because it was only a short-term solution. He suggested that Ross make a "write down" proposal.

In March of 1993, Ross submitted a proposal to reduce the principal of the loan from $2 million to $800,000 and to reduce the interest rate.[7] Rasmussen sent a reply a few days later, stating that the proposal was unacceptable, but that "the Bank would be interested in discussing with you the terms of a

---

[7]According to Jason Abt, this was not GW's understanding of "write down," which he described as an agreement under which for every dollar the borrower contributed in new money, GW would write down an additional dollar of the debt. For example, if the Auerbachs wanted the loan reduced from $2 million to $800,000, they would have to pay GW $600,000, and GW would write down an additional $600,000, leaving a $800,000 remaining balance. It

workout when a serious and reasonable proposal is forthcoming." In the meantime, the February and March payments were not made. GW sent a notice of default, and prepared and filed, but did not serve, a complaint for foreclosure and to seek appointment of a receiver. While giving notice of an ex parte hearing, GW's counsel spoke with counsel for the Auerbachs about whether GW would accept a deed in lieu of foreclosure. At the same time, GW began the process of conducting an appraisal.

On March 23, 1993, Ross received notice of default and spoke with Rasmussen's boss, Robert Roades, area manager of the major loan adjustments department.[8] He was told that to negotiate a loan modification, the Auerbachs had to be current on the loan payments, and that GW did not negotiate with delinquent borrowers.[9] The Auerbachs made the delinquent payments. Thereafter, GW demanded an additional monthly amount to be placed in an impound account for property taxes (which GW paid in April). GW's lawsuit was dismissed.

In May of 1993, Ross made an oral proposal to Rasmussen that GW take a deed in lieu of foreclosure. Rasmussen asserted that GW had concerns about taking title in that fashion, even after Ross offered to obtain a title insurance policy, at the Auerbachs' expense, to protect GW. In July of 1993, litigation counsel for the Auerbachs reiterated the offer of a deed in lieu of foreclosure and accused GW of breaching its duty to "deal fairly and in good faith" with the Auerbachs. Counsel for GW, Tina McKnight, discussed this proposal with the Auerbachs' litigation counsel, and also discussed the possibility of GW allowing a transfer to a shell corporation so that foreclosure would be on its record rather than the Auerbachs'. After rejecting this proposal on behalf of GW, McKnight received a letter from Naomi Norwood, counsel for the Auerbachs, dated August 6, 1993, which stated in part: "You advised me that Mr. Rasmussen is unwilling even to ask the investment committee because currently this is a 'performing asset.' [¶] . . . Mr. Rasmussen's refusal even to seek the investment committee's approval of a transfer is particularly difficult to understand and appears to be motivated solely to force the Auerbachs to continue to make payments, thereby enabling Mr. Rasmussen to retain his 'performing asset.' His refusal does not comport with the Bank's duty of good faith and fair dealing and we intend to pursue all remedies available to our clients."

There were no further communications between the parties for some time, except that the Auerbachs continued to make the payments due. In October

---

is not clear from the record whether this understanding of "write down" was conveyed to Ross.

[8] In September of 1993, Rasmussen was promoted to this position, and Jason Abt moved into Rasmussen's position.

[9] Roades, in his brief testimony at trial, did not deny having made such statements.

of 1993, Ross began negotiating with the State of California to lease the building.

In April of 1994, almost a year after the earlier discussions came to a halt, Ross proposed allowing the interest rate to adjust to 6.287 percent, which would have reduced monthly payments to $13,000. He made this proposal orally to Jason Abt, who had assumed Rasmussen's position, and in writing to Rasmussen. Abt responded negatively and Rasmussen did not respond at all.[10]

In May of 1994, Ross renewed the proposal of transferring the property to another entity and allowing GW to foreclose against that entity to save the Auerbachs' name and credit reputation. GW sent an assumption package for them to fill out, but Ross did not pursue the matter further because he was concerned GW would want a recourse loan if a new entity took over the existing loan. In addition, the state was indicating a renewed interest in leasing the property.

In August of 1994, Ross proposed that GW take $957,432 to pay off the loan (the balance on the note was then approximately $1.9 million). This proposal was sent to Abt. In September, after several calls from Ross, Abt responded stating that GW would be willing to "entertain a sale of the loan more in line with the value of the asset" although not the reduction proposed.

By letter dated October 17, 1994, Abt proposed a payoff of $1.6 million. Ross countered with a payoff proposal of $1,250,000. Ross also informed GW that the Auerbachs had finalized a lease with the state.[11] GW rejected the counteroffer, through Abt, and requested a copy of the new lease. After receipt of the lease, Abt again rejected the counteroffer, and GW made no new or different proposal of its own. Instead, Abt sent a letter in January 1995 stating that even the $1.6 million payoff proposal was unlikely to be approved by GW management.

*The Auerbachs' Complaint*

On January 24, 1995, the Auerbachs brought a complaint for declaratory relief, breach of the implied covenant of good faith and fair dealing, breach of contract, and promissory fraud. In the declaratory relief cause of action, the Auerbachs sought a declaration that GW was obligated to accept a deed in lieu of foreclosure or consent to transfer of title to a new entity so that

---

[10]Rasmussen testified that when he became area manager in September 1993, responsibility for the loan was assigned to Abt.

[11]The lease was not signed until December, but it was backdated to October.

foreclosure could proceed against the new entity rather than the Auerbachs. The complaint alleged that GW breached the covenant of good faith and fair dealing under the "Non-Recourse Note"[12] by failing to participate in negotiations for modification of the note and failing to accept a deed in lieu of foreclosure. The complaint further alleged that GW breached the preworkout agreement by failing to engage in negotiations to modify the Non-Recourse Note. The promissory fraud cause of action was based on entering into the preworkout agreement with no intention to participate in negotiations to modify the Non-Recourse Note, "solely to induce [the Auerbachs] to continue to make payments under the Non-Recourse Note to [GW]." The complaint made clear that the Auerbachs continued to own the property and make timely payments on the note.

*Significant Rulings at Trial*

Prior to trial, the parties informed the court that there was no dispute that the preworkout agreement was an enforceable contract. By motion *in limine*, GW sought to exclude oral promises at variance with the agreement and at the same time complained that it was unclear just what fraudulent promises the Auerbachs were contending had been made. In their trial brief, the Auerbachs had said that GW had made two misrepresentations: "First, as the Bank represented and the Preworkout Agreement demanded, the Auerbachs had to be current on their loan payments in order to seek modification of their Note. Second, the Bank represented both orally and through the Pre-workout Agreement that it would negotiate in good faith towards a possible modification. Both of these representations were false."

At trial, the Auerbachs' counsel stated that their fraud cause of action was based on the representation or promise that GW "would negotiate in good faith with [the Auerbachs] and [they] needed to keep the payments current and were required to keep the payments current." Counsel further stated that their fraud claim was based on failure to disclose two things: that loan proposals made by the Auerbachs "would not be presented for consideration to the loan committee with approval to modify the loan as long as [the Auerbachs] were making payments,"[13] and that GW "had an undisclosed policy never to modify a performing loan, therefore putting the borrower in

---

[12] The "Non-Recourse Note" was defined in the complaint as the promissory note and the nonrecourse agreement.

[13] In his testimony, Rasmussen conceded that the vice-president in the major loan adjustments department (the position held by him and later by Abt) had the power to make recommendations only, and could not formally approve a modification. Loans in the range of $2 million, such as the Auerbachs, had to be reviewed and approved by the area manager (the position to which Rasmussen was elevated during negotiations) and an oversight group called "Lapdog."

the Catch 22 position of being required to keep the loan current under the terms of the preworkout agreement so that [GW] would negotiate, not knowing that [GW] had a policy of not negotiating as long as the loan was current."

Counsel for GW directed the court's attention to the complaint and the trial brief, neither of which mentioned a cause of action for fraudulent concealment. The court ruled that "the complaint was sufficiently explicit . . . to allow the theory urged by [the Auerbachs' counsel]." The court further ruled that introduction of evidence to prove these allegations would not violate the parole evidence rule.

During trial, while cross-examining Mr. Auerbach, GW brought out evidence that the property had been transferred to the Family Trust and that the Family Trust's tax returns indicated ownership of the property and its profits and losses. The Auerbachs' probate attorney testified that when the Family Trust was created, deeds of trust were executed by the Auerbachs in blank so that legal descriptions could later be added. The description of the property involved here was added to a blank deed of trust and recorded by the attorney's office. During their lifetimes, the Auerbachs are the trustees of the trust and the sole beneficiaries.

The court denied a defense motion to dismiss based on the fact that the Family Trust had not been named plaintiff; granted a motion to amend to include the Family Trust as plaintiff; and informed the jury: "I have ruled as a matter of law that [the Auerbachs] have a right to amend the complaint to sue not only in their individual capacity but also as trustees for the Auerbach Family Trust. [¶] That means for your purposes if at the conclusion of this trial when you have heard all of the evidence, the instructions, and the arguments of counsel, if you believe that the Auerbachs either in their individual capacity or as trustees for the Auerbach Family Trust are entitled to any awards, you will treat them as one and the same."

*Reliance and Damages*

Ross testified that if he had known that GW would not modify the loan as long as payments were current, he would not have acted on behalf of the Auerbachs to cure the delinquencies, and that if he had known that the offers he presented were not presented to management, he would not have continued to cause the mortgage payments to be made.

Auerbach testified that if he had known that the investment committee was not going to review his proposals, he would not have signed the

preworkout agreement or paid the amounts due under the note. If he had known GW was not going to make any proposals, he would not have entered into the preworkout agreement. If he had known that GW was not going to consider modifying as long as he kept payments current, he would not have continued to make them.[14]

Ross testified that the property had a negative cash flow in 1996, 1995, 1994, 1993, 1992, and 1988. It had a positive cash flow in 1989, 1990, 1991, and 1997.[15] In addition, the Auerbachs paid for tenant improvements in the amount of $339,202. By combining the operating gains and losses for the period beginning in 1993, and adding the $91,845 commission paid to obtain the lease with the state, he came to the conclusion that they had been damaged in the amount of $742,944.[16] In addition, testimony established that in 1993, the Auerbachs paid $235,000 to GW in principal, interest, late charges, impound charges, and attorney fees payable under the preworkout agreement. Other testimony established that the Auerbachs paid $5,500 for the appraisal obtained by GW pursuant to the preworkout agreement.

During closing argument, counsel for respondents argued that total damages were $742,000, but conceded that the number should be reduced by the approximately 11 percent belonging to Ross. He asked the jury to award $661,000. He also referred to the $235,000 "[t]he bank . . . conned the Auerbachs into paying" in 1993.

*Jury Instructions*

The jury was instructed on breach of contract, breach of the implied covenant of good faith and fair dealing, promissory fraud, and fraudulent concealment. Concerning breach of the implied covenant claim, the jury was instructed: "The preworkout agreement entered into between plaintiffs and the defendant imposed a duty on the Auerbachs and Great Western Bank to act in good faith and deal fairly with one another during their attempt to negotiate a possible modification of the loan. [¶] The defendant Great Western Bank breached its obligation under the preworkout agreement if it

---

[14]He also testified, somewhat contradictorily, that he had never had a property go into foreclosure and was concerned about the negative impact on his credit rating and reputation, that he was making payments to avoid foreclosure, and that to allow a foreclosure would go "against [his] grain."

[15]The trial took place in June 1997.

[16]There were undoubtedly tax advantages to owning the property, such as depreciation and ability to shelter other gains. In addition, there were definite tax disadvantages to entering into a modification of the loan because forgiven debt is considered income. However, the court ruled that as a matter of law the jury could not consider tax advantages and disadvantages, and permitted only limited inquiry into this area. No issue on appeal has been raised concerning that ruling.

did not negotiate in good faith. The test for determining whether there has been a violation of the obligation of good faith and fair dealing in this case is whether Great Western Bank failed to negotiate in good faith with the plaintiff. If it did fail to do so, then such a violation is a breach of contract. [¶] . . . [¶] [T]he bank's enforcement of the loan documents does not relieve the parties of their obligation to negotiate a modification in good faith pursuant to the preworkout agreement contract."

Concerning promissory fraud, the jury was told that "the defendant must have made a promise to negotiate, and at the time it was made defendant must have intended not to perform the promise" and also that "[a] party claiming to have been defrauded by a false promise must have relied upon the promise. That is, the promise must have been a cause of plaintiff's conduct in entering into the preworkout agreement, curing the defaulted loan payments and resuming regular loan payments."

*The Verdict and Posttrial Motions*

The jury found in its special verdict that GW breached the preworkout agreement, and awarded respondents $207,155 in compensatory damages for breach of contract.[17] It found that GW breached the implied covenant of good faith and fair dealing and awarded the same $207,155. The jury further found that GW made a promise as to a material matter without intent to perform, and awarded the $207,155 yet again. There was a similar finding on fraud by nondisclosure and the same award of damages. In the next phase, the jury assessed $2.6 million in punitive damages. GW moved for a new trial and judgment notwithstanding the verdict, which motions were denied on September 15, 1997. This appeal followed.

DISCUSSION

I

. *Fraud*

In order to recover on a claim for fraud, the plaintiff must establish the "detriment proximately caused" by the defendant's tortious conduct. (Civ. Code, § 3333.) "Deception without resulting loss is not actionable fraud. [Citation.]" (*Service by Medallion, Inc.* v. *Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 [52 Cal.Rptr.2d 650].) In addition, "[o]ne defrauded in the purchase, sale or exchange of property is entitled to recover the

---

[17]How the jury arrived at that figure is unclear, but we note that it is very close to 88.75 percent of $235,000.

difference between the actual value of that with which the defrauded person parted and the actual value of that which he received . . . ." (Civ. Code, § 3343, subd. (a).) This means that "to establish a common law cause of action for deceit in the sale of a piece of property, a buyer must offer evidence that the price he or she paid for the property was greater than the actual value of the property." (*Saunders* v. *Taylor* (1996) 42 Cal.App.4th 1538, 1543 [50 Cal.Rptr.2d 395].)

Respondents' theory of recovery is based on the premise that a party duped into performing an existing contractual obligation has suffered damage. More specifically, they believe a borrower's reliance on a lender's fraudulent promise to engage in good faith negotiations to modify a loan, which causes the borrower to continue to make payments on a note secured by a seriously undervalued property, supports the reliance damages necessary to a fraud claim.

Generally speaking, a commitment to perform a preexisting contractual obligation has no value. In contractual parlance, for example, doing or promising to do something one is already legally bound to do cannot constitute the consideration needed to support a binding contract. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 221, p. 227; 2 Corbin on Contracts (rev. ed. 1995) § 7.1 et seq.; 3 Williston on Contracts (4th ed. 1992), § 7:36 et seq.)

The same understanding has carried over to the tort area. In *Conrad* v. *Bank of America* (1996) 45 Cal.App.4th 133 [53 Cal.Rptr.2d 336], cited by GW, the court rejected the notion that a bank's "false promise" to approve a new loan made to induce the plaintiffs to allow the bank to use certain proceeds to pay down their existing loan balance supported a claim of fraud. As the court explained: "It was established that the Bank had an existing security agreement with [plaintiffs' company] that gave it the right to use the . . . proceeds as payment for its existing loans. . . . Thus, well before the alleged promise of a loan, the Bank had the legal right to use the . . . proceeds for payment of its loans and plaintiffs had no legal right to prevent that procedure." (45 Cal.App.4th at p. 158.) Due to the fact that their purported reliance damages were based on an existing obligation, the court concluded that "[p]laintiffs failed to show damage specifically attributable to the short-lived promise of a loan and accordingly failed to establish a cause of action for fraud based upon that promise." (*Id.* at p. 160; see *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46] ["Justifiable reliance [for purposes of fraud in the inducement] exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which alters his legal relations, and when without such

misrepresentation or nondisclosure he would not, in all reasonable probability, have entered into the contract or other transaction"]; *Service by Medallion, Inc.* v. *Clorox Co., supra,* 44 Cal.App.4th at pp. 1818-1819 [cleaning company's purchase of materials in preparation for performing contractual promise "were essential to its subsequent performance of the service agreement and therefore could not have been considered detrimental"].)

Similarly, in *AB Group* v. *Wertin* (1997) 59 Cal.App.4th 1022 [69 Cal.Rptr.2d 652], two individual partners, Argyros and Ball, purchased a debt owed to a bank by their partnership, AW2. In an action for dissolution and accounting, the third partner, Wertin, contended it was improper for the other two to purchase the debt at face value and their failure to extract a downward modification of the debt breached a duty owed to the partnership. The referee who heard the accounting and dissolution phase of the litigation refused to " 'accept the argument that there is a breach of fiduciary duty for paying a legal debt.' " (59 Cal.App.4th at p. 1027.) The Court of Appeal was similarly unimpressed: "Wertin's brief is studded with references alluding to the traditional rule against partners grabbing for themselves opportunities which properly belong to their partnership. Argyros and Ball are alleged to have taken for themselves 'the opportunity to discount a partnership debt,' and thereby usurped 'the partnership's opportunities' for 'enormous discounts.' [¶] At the core of Wertin's argument, however, is an idea that dare not speak itself plainly. What Wertin is really saying, unadorned, is this: By the simple act of not paying a lawful debt, a debtor can force a discount from a creditor because of the risks and collection expenses associated with litigation. That *discount might vary,* depending on the facts of each case, but it was there for the taking (i.e., constituted a partnership 'opportunity'). Thus deconstructed, Wertin's argument plainly rests on the premise that in partnership matters it is ok—and sometimes even required—*not* to pay one's debts. [¶] Wertin appears to have overlooked the elementary proposition that a borrower *is* legally obligated to repay his or her loans. [Citations.]" (*Id.* at p. 1028, original italics.)

The attempt to forge a claim for intentional interference from these facts was met with similar skepticism by the court: "The opportunity to 'compromise AW2's and Wertin's debts with the Bank,' as Wertin's brief styles it, is predicated on what economists might describe as the 'frictional' costs of debt collection inflicted on a lender by an intransigent borrower. The opportunity to obtain a discount by the infliction of those costs can hardly qualify as an 'economic relationship' protected by tortious interference causes of action. The bystander who interrupts a robbery in progress may have interfered with the robber's prospective economic advantage, but that advantage is hardly one which the law recognizes as protectable. From the

viewpoint of a court in equity, the opportunity to extract a discount by threat of default is not too different." (*AB Group* v. *Wertin, supra,* 59 Cal.App.4th at pp. 1033-1034.)

Respondents believe there is a significant distinction between cases such as *Conrad* and *AB Group* and the present one due to the existence of the nonrecourse agreement. Although the Auerbachs' obligation to make payments under the promissory note was absolute in one sense, they had the power to stop making payments and walk away. As long as the nonrecourse agreement was in effect, GW would have had no remedy other than to foreclose on the property. Despite their personal wealth, the Auerbachs could not have been legally compelled to make one more payment to GW—or so respondents contend.

The flaw in respondents' theory, as GW points out in its brief, is that the Auerbachs, by conveying the property to the Family Trust, unwittingly extinguished the nonrecourse agreement under its express terms. Without deciding whether a lender's false promises made to induce nonrecourse borrowers to continue to make loan payments can ever support a claim of fraud, we conclude that the damages alleged are not viable under the specific facts before us here.

As we have seen, the promissory note contemplated that the property would be transferred to the Family Trust without acceleration and without payment of a transfer fee. However, at the same time, the nonrecourse agreement was clear that *any* "sale, transfer or other conveyance of all or any part of Borrower's interest in the Secured Property" would cause the agreement to terminate. Consequently, the Auerbachs' purported freedom to walk away from the loan was illusory, and their primary basis for damages was obliterated by the terms of the nonrecourse agreement itself. Since the property had been transferred to the Family Trust, GW could have pursued the Auerbachs individually had they defaulted.[18]

Respondents cite *Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308 [282 Cal.Rptr. 354] for the proposition that the Family Trust is not a separate entity from the Auerbachs as individuals and that the transfer thereto should be considered a nullity. *Torrey Pines* involved a couple who wanted to construct an apartment complex on a parcel of land. The parcel was purchased by their family trust, "a revocable living trust that they had created in 1982 as an estate planning device . . . ." (231 Cal.App.3d at p.

---

[18]Ross, the Auerbachs' agent, seemed to recognize this when he explained that the reason the Auerbachs did not pursue transfer to a new entity after GW sent the assumption package was his "concern[] they would make the loan recourse by way of the modification."

313.) The bank made a construction loan to the trust and obtained the couple's agreement to act as guarantors. Eventually, the borrower (the trust) defaulted and the bank obtained the property through nonjudicial foreclosure. This meant that per section 580d of the Code of Civil Procedure, the bank could not obtain a deficiency from the borrower, but could from a guarantor. The issue was whether the couple was a truly independent guarantor, because only then could their guarantee be effective under a long line of legal authority interpreting section 580d.

The court noted that there was "substantial identity between the individual guarantors and the debtor trustees." (*Torrey Pines Bank* v. *Hoffman, supra,* 231 Cal.App.3d at p. 320.) But it decided the case on a technicality in the law which no longer exists. At the time the loan was made, the law provided that " 'a trustee was personally liable on a contract unless the contract stipulated that the trustee was not liable.' " (*Id.* at p. 321.) "Accordingly, the law in effect at the time this loan was made is clear: These trustees were personally liable on the contract they entered into on behalf of the trust." (*Ibid.*) In other words, since the husband and wife were individually liable in their capacity as trustees of the family trust under statutes then in effect, they were primary obligors along with the trust as a matter of law, and were entitled to the protection of the antideficiency statute. The court did not have to decide whether they and the trust were separate entities or whether their relationship to the trust alone precluded them from being independent parties for purposes of the guarantee. As the court stated: "We emphasize that our holding is necessarily limited to these facts." (*Id.* at p. 323.)

In any event, we do not believe that the holding in *Torrey Pines* has significance here. The court in *Torrey Pines* was dealing with a legal question of statutory interpretation—whether under the antideficiency statutes a family trust and those individuals who comprise its trustees and beneficiaries should be considered one and the same. We are here concerned with interpretation of the parties' contract—whether the nonrecourse agreement was still in effect after the transfer of the property. Regardless of whether the Auerbachs and the Family Trust are separate and independent entities for purposes of the antideficiency statutes, the nonrecourse agreement is clear that any transfer of the property—including the transfer to the Family Trust contemplated by the promissory note—would cause the Auerbachs to lose the benefit of the nonrecourse agreement.

 Respondents also attempt to rely on the doctrine of merger, which states: " '[I]f a *single person* is simultaneously the owner of identical legal and equitable interests in the same thing, the equitable interest merges in the legal and absolute ownership ensues, without any division into legal

and equitable interests.' [Citation.]" (*Torrey Pines Bank* v. *Hoffman, supra,* 231 Cal.App.3d at p. 321, fn. 10, italics added, quoting Bogert, Trusts & Trustees (rev. 2d ed. 1984) § 129, pp. 397-398.) As *Hill* v. *Conover* (1961) 191 Cal.App.2d 171 [12 Cal.Rptr. 522], makes clear, merger does not apply if there is more than one trustee and beneficiary (even though all the trustees are also the beneficiaries) because " 'each is a trustee not only of his own beneficial interest but also for the beneficial interest of each of the others. . . . [E]ach of the beneficiaries has an equitable interest which is separate from the legal interest held by the whole group. No one of the trustees without the concurrence of the others could properly transfer an undivided legal interest in the property free of the trust.' " (191 Cal.App.2d at p. 180, quoting *Fry* v. *McCormick* (1951) 170 Kan. 741, 742 [228 P.2d 727, 729].) Although the trust instrument is not in our record, it is clear that there are at least two trustees—Mr. and Mrs. Auerbach—and at least the same two beneficiaries. The legal and equitable interests in the property cannot have merged.[19]

Our conclusion that the payments on the note made by the Auerbachs cannot be construed as damages under the facts of this case leaves some items that are properly recoverable. The evidence established that the Auerbachs paid GW $5,500 for an appraisal and $1,250 for legal fees under the preworkout agreement. Since these amounts were not preexisting obligations, there is no impediment to their recovery under a fraud theory. (See *Block* v. *Tobin* (1975) 45 Cal.App.3d 214, 219-220 [119 Cal.Rptr. 288] [$600 expended by prospective bidders in preparation for trustee's sale they were induced to believe would take place by defendants' deceit, could be recovered as reliance damages].) Ross and Auerbach testified that they entered into the preworkout agreement, and thus incurred these obligations, in reliance on GW's promise contained in the preworkout agreement that it would negotiate to modify the note. Respondents established GW's intent not to perform the preworkout agreement by Rasmussen's deposition testimony in which he answered "no" to the following question: "At the time you executed the preworkout agreement, was it your intention to negotiate with Mr. Ross and Mr. Auerbach in good faith to achieve a mutually agreeable modification of the note in lieu of being forced to take the property back?" In addition, several witnesses testified that GW had no policy which precluded negotiating a workout if loan payments were past due—a direct contradiction of Rasmussen's statement to Ross to the contrary. Rasmussen himself testified that generally, GW's philosophy, which he shared, was *not*

---

[19]We also note in this regard that the Family Trust has its own Internal Revenue Service identification number and files its own tax returns.

to modify as long as payments were being made and the loan was performing.[20]

That the Auerbachs incurred $6,750 in additional expenses as a result of reliance on GW's promise to negotiate a modification was uncontradicted. The jury believed that the promise was made without intent to perform, which finding is supported by Rasmussen's deposition testimony. The evidence supports that the Auerbachs did, therefore, suffer damages albeit not in the amount found by the jury, which also awarded $2.6 million in punitive damages. We cannot, however, simply reduce the damages and modify the award on the fraud cause of action at this stage. Because the jury was misled about the amount of compensatory damages it could award, its punitive damage award is suspect. ■ Although there is no fixed ratio, punitive damages must be proportional to recoverable compensatory damages. (See, e.g., *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) Because the punitive damages are out of proportion to the actual damages suffered by the Auerbachs, the punitive damage claim will have to be retried. (See *Torres* v. *Automobile Club of So. California* (1997) 15 Cal.4th 771, 774 [63 Cal.Rptr.2d 859, 937 P.2d 290] [appellate court may order retrial on punitive damage issue alone despite provision in section 3295, subdivision (d) of the Civil Code which states: ". . . Evidence of profit and financial condition shall be presented to the same trier of fact that found for the plaintiff and found one or more defendants guilty of malice, oppression, or fraud"].)

## II

### Breach of Contract

■ The parties conceded on the first day of trial that the preworkout agreement was a contract. In addition, Rasmussen and Abt both testified that they had no doubt that the preworkout agreement obligated them to negotiate in good faith. Thus, we have no occasion to consider whether GW's promise to engage in negotiations to modify the note is a valid contract as opposed to an unenforceable "agreement to agree." (See discussion in *Racine & Laramie, Ltd.* v. *Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1032-1033, & fn. 4, 1033-1034 [14 Cal.Rptr.2d 335], and cases cited therein.) Instead, GW avers that the Auerbachs' conveyance of the property to the Family Trust undermined the breach of contract damages as well as the fraud damages. We turn to the question of whether the damages for

---

[20]The fact that both Rasmussen and Abt testified that there were one or two situations where modifications were made even though the loan was current does not affect the falsity of Rasmussen's statement that GW would work with them *only* if the loan was kept current.

which evidence was introduced at trial can support the Auerbachs' claim for contract damages.

■ "The basic object of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. [Citations.] The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised." (*Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 [277 Cal.Rptr. 40]; accord, *State of California* v. *Pacific Indemnity Co.* (1998) 63 Cal.App.4th 1535, 1551 [75 Cal.Rptr.2d 69].) In other words, damages for breach of contract to negotiate in good faith must be predicated on the outcome that would have been reached had the defendant been negotiating in good faith.

■ We see no evidence in the record to indicate a serious attempt at trial to quantify the benefit the Auerbachs would have received if GW had bargained in good faith. Other than the two small items which comprise reliance damages, the evidence was concentrated on establishing (1) the amount the Auerbachs lost from a cash flow perspective during the time they held the property and (2) the amount of payments the Auerbachs made during 1993. From a contractual standpoint, the former figure had no significance whatsoever. There was no proposal for modification made by either side which would have reimbursed the Auerbachs for the amount they had sunk into the property prior to and during the negotiations.

The latter figure has significance only if we could reasonably presume that the outcome of good faith bargaining sessions would have resulted in a deal which allowed the Auerbachs to entirely stop payments on the note for one year, never make up those payments, and yet continue to own the property. Good faith did not require GW to accede to such a one-sided modification. (See *Phoenix Mut. Life Ins. Co.* v. *Shady Grove Plaza Ltd.* (D.Md. 1990) 734 F.Supp. 1181, 1190 ["That duty [to bargain in good faith] does not prohibit a party from bargaining to its own economic advantage . . . ."]; *A/S Apothekernes Laboratorium* v. *I.M.C. Chemical* (7th Cir. 1989) 873 F.2d 155, 159 [" '[O]ne cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party.' "], quoting *Feldman* v. *Allegheny Intern., Inc.* (7th Cir. 1988) 850 F.2d 1217, 1223.) GW's self-interest would have required it to obtain some concession from the Auerbachs, which would have diluted the financial benefit to the Auerbachs of a one-year payment interruption. Without some basis for calculating the actual financial benefit to the Auerbachs from a temporary moratorium on payments, the damages awarded by

the jury for breach of contract are the result of pure speculation and cannot be sustained.

## DISPOSITION

The judgment on the breach of contract cause of action is reversed. The damage award for the fraud cause of action is modified to $6,750. The award for punitive damages is reversed and the matter is remanded for retrial on punitive damages. Each side to bear its own costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied October 14, 1999, and respondents' petition for review by the Supreme Court was denied December 21, 1999.