[No. A116364. First Dist., Div. One. Feb. 22, 2008.]

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 250, et al.,
Plaintiffs and Respondents, v.
TORREN COLCORD et al., Defendants and Appellants.

COUNSEL

The Evers Law Group and Geoffrey O. Evers for Defendants and Appellants.

Weinberg, Roger & Rosenfeld, William A. Sokol, Theodore Franklin, Emily P. Rich and Roberta D. Perkins for Plaintiffs and Respondents.

OPINION

MARGULIES, J.—Torren Colcord and Stacy Rutherford appeal from a judgment for compensatory and punitive damages in favor of their former employer, Service Employees International Union, Local 250 (Local 250). The trial court found Colcord and Rutherford liable for breach of fiduciary duty for secretly organizing—while still employed as field representatives by the union—a campaign to decertify Local 250 as the collective bargaining agent for Northern California emergency medical technicians.

Defendants contend that the trial court erred in awarding as compensatory damages (1) the cost of Colcord's Local 250 salary and benefits during the period in which the breaches occurred; and (2) approximately $300,000 in campaign costs Local 250 incurred in its unsuccessful effort to prevent decertification. We affirm the award for salary and benefits paid, but set aside the award of campaign costs because no substantial evidence supports the finding that these were proximately caused by defendants' tortious conduct. We remand the matter to allow the trial court, if it chooses to, to reconsider the amount of punitive damages awarded against Colcord in light of this court's partial reversal of the compensatory damages award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts*

The following is drawn primarily from the trial court's statement of decision:

Local 250 represents approximately 90,000 hospital and other health care workers in California. Until 2005, the union's emergency medical services (EMS) division represented approximately 3,000 paramedics and emergency medical technicians (collectively, EMT's) employed by various ambulance companies around California, the largest of which was American Medical Response (AMR).

In early 2004, defendants Colcord, Rutherford, and Timothy Bonifay were employed by Local 250 as field representatives.[1] Their job was to represent the union in the workplace locations where Local 250 was the authorized bargaining agent for the EMT's. Their duties included recruiting, training, and supporting the shop stewards at each workplace, assisting the shop stewards as necessary in grievance and other workplace issues, negotiating collective bargaining agreements, assisting in union-organizing efforts at nonunion employers, and serving as a conduit between rank-and-file union members, the shop stewards, and the union leadership.

Bonifay worked as an EMT from 1984 to 1993. He spearheaded Local 250's successful campaign to organize the EMT's at his workplace in 1989, and joined Local 250's staff as a field representative in 1993. Colcord had been an EMT since 1989 or 1990 and had helped Local 250 to organize his employer in Stockton in 1996 or 1997. Bonifay recruited Colcord to be a shop steward in approximately 1999. Colcord eventually was elected as the chief shop steward. At Bonifay's recommendation, Local 250 hired Colcord as a field representative in approximately 2000 or 2001. Rutherford began work for AMR as a field training officer in Santa Clara County in 2001, and was later assigned to administrative duties although he continued to be a union member covered by Local 250's collective bargaining agreement. He was elected chief shop steward in Santa Clara County and served in that position from 2002 until January 2004. At the end of January 2004, Rutherford went to work as a field representative for Local 250, taking a temporary leave for that purpose from his AMR position, as allowed by the collective bargaining agreement.

On January 5, 2004, Colcord and Bonifay—who for some time had been dissatisfied with Local 250's policies and practices—began discussing various possible courses of action, one of which was to start a competing union that would represent only EMT's. Beginning with that conversation and continuing through their resignations from Local 250 on February 25, 2004, Colcord and Bonifay planned and took steps to launch a competing union that would immediately seek to decertify and replace Local 250 as the bargaining unit for the EMT's then represented by the union.[2] Colcord and Bonifay knew Rutherford shared some of their frustrations with Local 250, recognized him as a leader in Local 250's large San Jose bargaining unit, and eventually also enlisted him in their effort to launch a competing union.

---

[1] Bonifay is not a party to this appeal.

[2] Under the National Labor Relations Act (29 U.S.C. § 151 et seq.), if a competing union gets at least 30 percent of a bargaining unit's employees to sign a petition requesting decertification of the existing union, the question of which union, if any, should represent the unit must then be put to a vote of the employees. (29 U.S.C. § 159(c)(1)(A)(ii); 29 C.F.R. § 101.18(a) (2007).)

Defendants became aware of a key timing issue regarding the launch of a new union. An effort to decertify Local 250 could as a practical matter only be launched during the "contract window bar"—a period of time shortly before the expiration of the then existing bargaining agreement with AMR, the largest EMT employer in the state, which was due to expire in April 2004. This meant that to optimize its chance of replacing Local 250, the new union and decertification campaign had to be launched in late February and completed in March.

While still employed by Local 250, defendants met with legal counsel to plan the decertification campaign, form the new labor organization, and draft a constitution, bylaws, and decertification petition. Defendants also prepared a PowerPoint presentation to introduce the new venture to key union members. Throughout this time, defendants made every effort to keep their plans secret from their superiors in Local 250. Secrecy was important because defendants knew that if the Local 250 leadership got wind of their efforts to start a competing union, they would be replaced with new field representatives and the union would make a major effort to address whatever member concerns were fueling discontent with Local 250. Maintaining the element of surprise was an explicit component of defendants' strategy to win decertification since the more advanced the campaign was when Local 250 learned of it the less the union could do to respond to it.

Thus, even though part of defendants' job was to keep the union leadership apprised of what was going on in the field, and especially of any effort by a rival union to raid the EMT division, defendants took every precaution to hide their activities. The defendants' e-mail traffic with one another evidenced a strong desire to maintain secrecy as well as an understanding that it was their duty as field representatives to inform Local 250 of what was going on. Defendants referred to this as their "don't tell yourself" situation. Defendants breached their duties to Local 250 in other respects as well. Bonifay deliberately stalled the negotiation of a collective bargaining agreement with the Oak Valley Hospital District because, if a new agreement had been reached between Local 250 and the district, the new union—which defendants named the National Emergency Medical Services Association or NEMSA—would have to wait until the end of the contract term to seek decertification. Defendants also sought to block ratification of a new contract by a Boston affiliate of Local 250's national union in hopes of pursuing a decertification effort there.

The new union and the open decertification campaign were kicked off at a meeting of Local 250 shop stewards on February 25, 2004. Colcord and Bonifay used their knowledge of the union shop stewards, and of the stewards' attitudes about Local 250, to invite to the meeting only those individuals they thought would be sympathetic to their cause and influential with the rank and file. In calling the meeting, they represented that it was an "extremely important" union meeting, i.e., a Local 250 meeting. They did not disclose the subject of the meeting but made it clear to invitees that "it will change your life." Once the group was assembled, Colcord and Bonifay presented a PowerPoint presentation for NEMSA and had the shop stewards collecting signatures for the decertification petition the same day. Simultaneously, a NEMSA Web site went live, and defendants each sent e-mails to Local 250 resigning immediately from their union positions without reference to the decertification effort in which they were now openly involved. It took Local 250's leadership a day or two after receiving the resignation e-mails to determine the nature and scope of the attack. Colcord wrote in an e-mail to the other defendants, "It is not chance that John [Boros, administrative vice-president of Local 250] and company are completely unprepared and baffled at what to do."

By February 26, defendants had recruited 25 EMT's to act as organizers for NEMSA's decertification effort. These individuals represented the core leadership of the rank and file of Local 250's EMS division. Most had signed up at the meeting on the 25th. Within two and a half weeks, defendants and their supporters were able to gather substantially more signatures than the 30 percent required to force a decertification election. The decertification petitions were filed with the National Labor Relations Board on March 12, 2004, 10 days earlier than the date that defendants believed was their deadline for getting the petitions filed. Due to objections and appeals, three representation elections were eventually held. NEMSA won the third and final election, and it is now the authorized bargaining agent for the EMT's.

## B. *Trial Court Proceedings*

Local 250 sued defendants for (1) breach of fiduciary duty under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) (29 U.S.C. § 501), and under common law; (2) fraudulent concealment; (3) unfair business practices; and (4) misappropriation of trade secrets. Local 250 sought to recover the salaries paid to defendants while they were secretly organizing NEMSA, the costs incurred in contesting the first of the three representation elections, and punitive damages.

After a bench trial, the trial court held that (1) there was overwhelming evidence that defendants breached their fiduciary duties to Local 250 under LMRDA and common law; (2) fraud by concealment was also clearly established by defendants' conduct in actively concealing activities that they were dutybound to disclose as fiduciaries; (3) defendants' conduct in using their positions as fiduciaries in one enterprise as a platform to secretly launch a competing enterprise constituted unfair competition under Business and Professions Code section 17200; and (4) there was insufficient evidence to establish Local 250's trade secrets claim regarding lists used by defendants containing names and contact information for Local 250's EMT members and shop stewards.

The trial court awarded Local 250 its salaries paid to Colcord and Bonifay of $40,905.84 each for the relevant time period, both as damages for breach of fiduciary duty and fraud and as restitution under Business and Professions Code section 17200. In addition, the court awarded Local 250 $300,387.78 against all defendants for its costs in salary and expenses incurred in the first decertification election. Finally, the court awarded $60,000 in punitive damages against Colcord.

Defendants Colcord and Rutherford timely appealed from the ensuing judgment.

## II. DISCUSSION

Defendant Colcord contends that both components of the compensatory damages award against him—the cost of his salary and benefits and Local 250's campaign costs for the first decertification campaign—were improper as a matter of law. Colcord maintains that the $60,000 punitive damages award against him must also be set aside. Rutherford, who is affected only by the award of campaign costs,[3] joins in Colcord's arguments on that issue.

### A. *Salary and Benefits Award*

Colcord argues that it was illegal as a matter of federal and state law for Local 250 to recoup any salary and benefits paid to him for any time period in which he was performing work for the union, even if he was simultaneously working against the union's interests. We are not persuaded.

Colcord relies principally on a federal Department of Labor regulation, 29 Code of Federal Regulations part 541.602 (2007) (hereafter part 541.602), which sets forth the "salary basis test." The "salary basis test" is

---

[3] Local 250 put in no evidence concerning Rutherford's salary and benefits.

one of three tests that are used under the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.) to determine whether employees who are classified by their employers as salaried and exempt from overtime pay requirements are in fact properly subject to exemption. (*Klem v. County of Santa Clara, California* (9th Cir. 2000) 208 F.3d 1085, 1089–1090.) Part 541.602 states in relevant part: "An employee will be considered to be paid on a 'salary basis' within the meaning of these regulations if the employee regularly receives each pay period . . . a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to [exceptions not applicable here], an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." (§ 541.602(a).)[4]

State law requirements match or exceed those adopted under the federal FLSA regulations, including the salary basis test. (See Lab. Code, § 515, subd. (a).)[5] Thus, unless one of the regulatory exceptions applies, a California employer is subject to a lawsuit for overtime pay by the affected employees if it has an actual practice of paying its salaried employees less than the full amount of their predetermined salary for any week in which they perform any work for the employer, or it follows an employment policy that created significant likelihood of such a result. (See *Auer v. Robbins* (1997) 519 U.S. 452 [137 L.Ed.2d 79, 117 S.Ct. 905]; *Conley v. Pacific Gas & Electric Co.* (2005) 131 Cal.App.4th 260, 267 [31 Cal.Rptr.3d 719].)

■ But the present lawsuit involves no overtime pay claim against Local 250. Here, Local 250 did in fact pay Colcord on a salary basis in apparent conformity with the applicable overtime rules, and he makes no claim that the

---

[4] Part 541.602 became effective in August 2004. (69 Fed.Reg. 22122, 22260–22274 (Apr. 23, 2004).) However, the quoted language was also found in the version of the salary basis regulation in effect at the time of defendants' employment by Local 250. (See 29 C.F.R. § 541.118(a) (2004).)

[5] Labor Code section 515, subdivision (a) authorizes the state's Industrial Welfare Commission (IWC) to establish exemptions from the overtime pay requirements found in Labor Code sections 510 and 511 for executive, administrative, and professional employees, provided that the employee meets the established tests for the exemption. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 324 [17 Cal.Rptr.3d 906, 96 P.3d 194].) But IWC wage orders must be at least as protective of overtime pay as the federal regulations. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795 [85 Cal.Rptr.2d 844, 978 P.2d 2].) California's Division of Labor Standards Enforcement (DLSE) is the state agency charged with administering and enforcing the state's labor statutes and wage order regulations. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561–562 [59 Cal.Rptr.2d 186, 927 P.2d 296].) To a substantial degree, the DLSE has followed the federal salary basis test. In a March 1, 2002 opinion letter, the DLSE stated that " '[t]he deductions from salaries allowed under [the pre-2004 federal salary basis regulation] also are permitted under state law . . . .' " (*Sumuel v. ADVO, Inc.* (2007) 155 Cal.App.4th 1099, 1109 [66 Cal.Rptr.3d 622].)

union followed any contrary practice or policy. His salary and benefits were awarded back to Local 250 as *compensatory damages or restitution* for the tortious wrong he committed against his employer. Colcord cites no case in which the federal salary basis regulation or any California state law equivalent has been found to bar such an award. Such a holding would not, in fact, make any sense. Part 541.602 is not even a mandate on employers, much less a mandate binding on a court in awarding damages or restitution. It is simply a test applied to see if an employer may properly classify and pay an employee as an exempt, salaried employee or must pay the employee for overtime work. (See generally *Sumuel v. ADVO, Inc., supra*, 155 Cal.App.4th 1099.) Nothing in its language or the legal context in which it has been applied suggests that the federal salary basis regulation (or its state law equivalent) in any way controls the employer's legal right to recover salary and benefits previously paid to a faithless employee as damages or as restitution in a civil lawsuit for breach of fiduciary duty.[6]

■ The disgorgement of salary and benefits was an appropriate remedy in this case. (See, e.g., *J. C. Peacock, Inc. v. Hasko* (1961) 196 Cal.App.2d 353, 358 [16 Cal.Rptr. 518] [employee or agent who violates fundamental duty of loyalty cannot recover even for the services he has rendered]; *Purolator Products, Inc. v. Torite Industries, Inc.* (9th Cir. 1969) 413 F.2d 989, 990 [upholding award of damages including employees' salary from employer during period when they were secretly competing with the employer]; Rest.2d Agency, § 403 ["If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal."].) Colcord supported himself with compensation received from Local 250 while he plotted against its interests. Had he resigned as soon as he embarked on competition with Local 250, or had he honored his fiduciary duty to Local 250 by disclosing defendants' activities, the union would not have continued to pay him. Thus, as the trial court observed, defendants' "salaries and benefits are damages directly flowing from the breach of defendants' fiduciary duties." Although Local 250 might have had to incur the cost of paying similar salary and benefits to a replacement employee for Colcord, it would have had that replacement's undivided loyalty in return. Colcord's conduct deprived the union of that vital benefit.

We find no error in the trial court's award to Local 250 of the costs it incurred in providing salary and benefits to Colcord during the time he was organizing a competing union.

---

[6] We note parenthetically that for a substantial part of the time in issue Colcord was not in fact performing any work for Local 250 but was on sick leave. He ventures no explanation as to why part 541.602(a) could have any application by its own terms to any workweek in which he performed no work.

## B. *Campaign Costs*

Defendants raise a series of objections to the award of Local 250's costs incurred in the first decertification election, including the claim that such an award was based on no more than speculation as to whether Local 250 could have avoided those costs if defendants had not breached their fiduciary duties. We agree with defendants that the election cost award is speculative and cannot be sustained.

The trial court recognized that defendants could have resigned on January 5, 2004, and pursued all of the activities they in fact engaged in without breaching any duty owed to Local 250. Their breach of fiduciary duty consisted of choosing to stay on the Local 250 payroll and secretly devote their energies to undermining and replacing Local 250. Thus, the difficult proximate cause issue presented by Local 250's claim for election cost damages was whether defendants could have gathered the necessary 30 percent of signatures required to force a decertification election if they had resigned on January 5, 2004, and relied on their own contacts and knowledge of the EMT membership to mount the signature-gathering campaign. A number of factors on the record strongly suggest that defendants would have been successful even if (1) they had resigned on January 5; (2) Local 250 promptly learned of their intention to circulate decertification petitions; and (3) the union reassigned staff immediately to try to dissuade the EMT membership from supporting decertification.

First, all three defendants had extensive personal contacts with and knowledge of the EMT community in Northern California, as well as considerable union-organizing experience. Bonifay had worked as a field representative with EMT's for 10 years. Part of the field representative's job was to build up a network of shop stewards. He had previously been an EMT from 1984 to 1993, and had taken a leadership role in organizing his workplace for the union. He had also helped the union run organizing efforts among unrepresented EMS workers. Colcord had been a field representative since 2000 or 2001, and had been an EMT for 10 years before that. He had helped to organize the union at his workplace and he had served as a shop steward and chief shop steward. Before becoming a Local 250 field representative in 2004, Rutherford was the chief shop steward in Santa Clara County, which had 400 EMT's, the largest number AMR employed in California. Rutherford had worked closely with the other stewards in Santa Clara County on a range of labor-management issues there.

Thus, defendants had the ideal qualifications to lead a successful decertification campaign. They were recognized leaders in the EMT community and had established a network of personal relationships in that community,

especially among the rank-and-file leadership. They were thoroughly familiar with the attitudes, concerns, and grievances of Local 250's EMT membership. They possessed organizing skills and savvy gleaned from years of frontline union activism. Local 250's own expert on decertification campaigns, Glenn Goldstein, testified that defendants' success in displacing Local 250 was "substantially based on the pre-existing relationship that they had . . . with the members and the shop stewards of our union . . . . [a]nd that . . . pre-existing relationship really provided a substantial inroad into the raid that they conducted." Goldstein also opined that one of the most important tasks in mounting a successful decertification campaign is to develop an effective message and critique of the incumbent union. He observed that defendants were able to use their relationships and ongoing discussions with union members to craft a message that resonated with a significant base of Local 250 members.

Second, it is clear from the record there was especially fertile ground for a decertification effort among EMT's in January 2004. Unhappiness with Local 250 among rank-and-file EMT's was to all appearances widespread. Bonifay testified that he had come to the conclusion that Local 250 was vulnerable to decertification months if not years before 2004. Rutherford testified that he told the Local 250 official who interviewed him for the field representative position that members were unhappy and felt forgotten. He had heard the possibility of bringing in another union discussed among the members for as long as he had worked in the EMS field. Rutherford reported there was great frustration among the Santa Clara County members that Local 250 was doing nothing to help them deal with local issues. Colcord testified that he could not get EMT's to attend Local 250 meetings in 2003 because they "hated" the union.

Third, the petition campaign was wildly successful, far exceeding defendants' expectations. Colcord testified that NEMSA effectively recruited the core leadership of the EMS division's rank-and-file membership, overnight, to be NEMSA organizers. His team was able to gather 500 of the approximately 700 signatures needed for decertification in just the first 24 hours of the campaign. According to the testimony of Bonifay, in under three weeks defendants were able to amass the signatures of over 90 percent of the full-time EMT employees of AMR. Defendants were able to file their petitions, with far more than the minimum number of signatures required, 10 days before the deadline they had originally set for themselves.

Before issuing its statement of decision, the trial court was troubled by whether the evidence for attributing Local 250's election costs to defendants' breaches of fiduciary duty was too speculative. Although Local 250's expert, Glenn Goldstein, had opined that keeping the union in the dark until the

campaign was ready to be launched was a key to the effort's viability, the trial court found the testimony unhelpful. As the court observed, Goldstein based his analysis on a comparison to campaigns in which outsiders, who are unfamiliar with the issues and leaders in a bargaining unit, come in and try to organize opposition to the incumbent union from scratch.

In explaining its decision to nonetheless award Local 250 its election cost damages, the court relied on three factors. First, defendants unquestionably gained an element of surprise by delaying their resignations until February 25. As the trial court pointed out, that allowed them to jump-start their campaign before Local 250 had any opportunity to organize a counterattack. But given the depth of discontent among union members and the rapidity with which defendants' team was able to gather the necessary signatures once the campaign began, it is hard to see this as a decisive factor in its successful outcome. Since a majority of the members ultimately voted Local 250 out, there is no reasonable basis for assuming that with a few more weeks to campaign, Local 250 could have persuaded enough members not to sign a decertification petition to prevent a vote from taking place.

Second, the trial court pointed to defendants' asserted advantage in being able to call the key shop stewards to the February 25 meeting on the pretext that it was a Local 250 meeting. But this group of stewards was handpicked by defendants because they were least likely to be supportive of Local 250. It was almost certainly Colcord and Bonifay's personal, telephonic appeals to the stewards that got them to attend, not the use of Local 250's name.[7]

Finally, the court observed that by delaying their resignations until after seeing the positive response of the shop stewards at the February 25 meeting, the defendants were able to resolve any lingering doubts they might have harbored about the venture before fully plunging into it themselves. However, the evidence showed that defendants tried to time their resignations to arrive shortly before the February 25 meeting began. While it might have been advantageous to defendants to hold on to their Local 250 jobs until February 25, doing so did not significantly reduce the personal risk they were taking, nor was there any evidence that being able to look forward to a few more weeks on the union payroll played a significant role in facilitating their decision to move forward.

---

[7] Colcord testified that it usually was not easy to get stewards to come to a Local 250 meeting that was far away from their home bases. In fact, Local 250 had sent letters to Bonifay and Colcord in April 2003 reprimanding them for failing to recruit sufficient members from their areas to attend union meetings and activities.

The relevant legal principles have been stated as follows: "Causation requires proof that the defendant's conduct was a ' "substantial factor" ' in bringing about the harm to the plaintiff. [Citations.] Tortious conduct is ' "not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not [committed the tort]," ' unless the defendant's conduct operates with another force and ' "each of itself is sufficient to bring about harm . . . ." ' [Citation.] . . . [¶] A plaintiff cannot recover damages based upon speculation or even a mere possibility that the wrongful conduct of the defendant caused the harm. [Citations.] Evidence of causation must rise to the level of a reasonable probability based upon competent testimony. [Citations.] 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' " (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132–133 [39 Cal.Rptr.2d 658].)

In our view, there was no substantial evidence that Local 250 would have avoided the costs of a decertification election if defendants had not breached their fiduciary duties, nor was there any evidence or claim that defendants' tortious conduct was sufficient in itself to cause that harm. The evidence that defendants would have been unsuccessful in their decertification campaign, or would not have dared to attempt it had they not breached their fiduciary duty to Local 250 is simply too speculative to support the judgment in that regard.[8]

## C. *Punitive Damages*

Defendant Colcord fails to demonstrate any error in the award of punitive damages against him. The compensable damages suffered by Local 250, as affirmed on this appeal, are sufficient to sustain a punitive damages award. Colcord's claim that the award is excessive in light of his low net worth is offered without any citation to the evidence, and is unpersuasive. Colcord's intentional tortious conduct was sufficiently egregious that a punitive damages award was entirely appropriate.

However, because the trial court based the amount of punitive damages that it assessed against Colcord, in part, on the aggregate amount of compensatory damages awarded, the court, on remand, should have an opportunity to reconsider the amount of this punitive damage award if it chooses to do so.

---

[8] We do not reach defendants' further claims that this element of the damage award is preempted by federal law or supported in part by inadmissible evidence.

## III. DISPOSITION

The matter is remanded to the trial court to set aside the award for Local 250's election costs as to defendants Colcord and Rutherford. The trial court, on remand, may, if deemed reasonable or necessary, reconsider the amount of punitive damages awarded against defendant Colcord as well. The judgment is affirmed in all other respects. Each side to bear its own costs on appeal.

Stein, Acting P. J., and Swager, J., concurred.