Filed 11/21/14 opinion after granting rehearing on our own motion

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BOBBIE IZELL et al., | B245085 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC469931) |
| v. | |
| UNION CARBIDE CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Steven J. Kleifeld, Judge.  Affirmed.

Mayer Brown LLP, Michele Odorizzi; McKenna, Long & Aldridge LLP and David K. Schultz for Defendant and Appellant.

Baron & Budd, P.C., John Langdoc, Denyse Clancy and Christine Tamer for Plaintiffs and Respondents.

_____

[*]      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of section 2 of the Discussion.

# INTRODUCTION

Union Carbide Corporation appeals from a judgment entered in favor of Plaintiffs Bobbie Izell and Helen Izell on claims for personal injuries and loss of consortium stemming from Mr. Izell's alleged exposure to Union Carbide asbestos and subsequent diagnosis with mesothelioma. After a four-week trial the jury returned special verdicts finding Union Carbide 65 percent comparatively at fault for Plaintiffs' injuries and awarding Plaintiffs $30 million in compensatory damages plus $18 million in punitive damages against Union Carbide. By remittitur, which Plaintiffs accepted, the trial court reduced the compensatory damage award to $6 million, but declined to disturb the punitive damages.

On appeal, Union Carbide contends the evidence was insufficient to support the liability finding, apportionment of comparative fault, and the remitted compensatory damage award. Union Carbide also challenges the punitive damage award as excessive. We conclude the evidence was sufficient to support the verdict, as well as the compensatory and punitive damage awards. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Union Carbide purchased an asbestos mine near Coalinga, California in 1963. Until 1985, Union Carbide supplied asbestos to companies that manufactured and marketed products for the construction industry.

Mr. Izell owned a construction business that built approximately 200 homes in southern California from 1964 until 1994. Mr. Izell did not work as a laborer or supervisor on these projects, but he regularly visited and walked through the construction jobsites. All the homes were constructed with drywall interiors. Mr. Izell's workers applied various brands of premixed joint compound to cover nail heads, fill the seams between drywall boards, and fill corner sections of drywall. Once the joint compound dried, the workers sanded it one to three times, usually with sandpaper on a long pole, then by hand. Mr. Izell often was present when his workers sanded the joint compound. He described the resulting dust as a "little fog in the air." He also recalled breathing dust that was disturbed when his workers swept the excess joint compound from the floor.

2

Mr. Izell's workers also used gun plastic cement to apply stucco to the homes' exterior.  Mr. Izell was present when his workers tore open bags of gun plastic cement, and he breathed the dust from those products as well.

Mr. Izell recalled seeing four different brands of joint compound on his jobsites and two brands of gun plastic cement.  Of the joint compound brands, Mr. Izell believed Georgia Pacific was the most common brand because it was the "dominate seller in those days," followed by Hamilton Red Dot, Kaiser Gypsum, and Kelly-Moore's Paco brand.  Mr. Izell also saw his workers use Riverside and Colton gun plastic cement.  At varying times from 1970 to 1978, Union Carbide supplied asbestos to each of the four joint compound manufacturers and to Riverside for use in its gun plastic cement.

In July 2011, at the age of 85, Mr. Izell was diagnosed with mesothelioma.  Initially, Plaintiffs sued more than 20 defendants who were allegedly responsible for the asbestos-containing products to which he claimed he was exposed.  By trial, only five defendants remained, including Union Carbide, one joint compound manufacturer (Kaiser Gypsum), one stucco manufacturer (La Habra) and two gun plastic cement manufacturers (Colton and Riverside).

After hearing percipient witness and expert medical and scientific testimony, the jury returned a special verdict finding all defendants liable on all theories of strict product liability and negligence.  The jury awarded Plaintiffs a total of $30 million in compensatory damages, consisting of $5 million in past and $10 million in future non-economic damages to Mr. Izell and $5 million in past and $10 million in future loss of consortium damages to Mrs. Izell.

The special verdict form also asked the jury to apportion comparative fault among the defendants, Mr. Izell, and six other entities, consisting of three joint compound manufacturers (Georgia Pacific, Hamilton, and Kelly-Moore), two asbestos suppliers (Carey Canadian and Johns-Manville), and an unnamed asbestos-cement pipe manufacturer.  The jury apportioned 95 percent of the fault to the five defendants, assigning 65 percent to Union Carbide, 20 percent to Kaiser Gypsum, and a total of 10 percent to the three stucco and gun plastic cement manufacturers.  The jury allocated the

remaining 5 percent to the non-defendant joint compound manufacturers and asbestos suppliers, finding each responsible for a 1 percent share of the comparative fault. No fault was apportioned to Mr. Izell or the asbestos-cement pipe manufacturer.

The jury also found Union Carbide and Kaiser Gypsum acted with "malice, oppression or fraud." (Boldface omitted.) Kaiser Gypsum settled before the jury was asked to decide the amount of punitive damages.

For the punitive damage phase, Union Carbide stipulated that it had a present net worth of $4.2 billion. The court instructed the jury that it should consider a variety of factors in deciding the amount, if any, of punitive damages to award, including a "reasonable relationship between the amount of punitive damages" and the harm to Mr. Izell. The jury also was instructed that it could consider evidence of harm caused to others for purposes of assessing reprehensibility, but not for purposes of "punishing the defendant directly for harm caused to others."

In his argument to the jury, Plaintiffs' counsel commented there was probably no amount of money that could deter Union Carbide, given its $4.2 billion net worth. Thus, counsel suggested the jury award something in the range of $8.6 million ($100,000 for each year of Mr. Izell's life) and $18 million ($1 million for each year Union Carbide sold asbestos after it knew its product caused cancer). The jury returned a verdict awarding Plaintiffs $18 million in punitive damages.

Union Carbide moved for judgment notwithstanding the verdict (JNOV) and a new trial on all issues, including punitive damages. The trial court denied the JNOV motion, but conditionally granted a new trial "on the ground of excessive compensatory damages only," unless Plaintiffs consented to a remittitur reducing the compensatory damage award from $30 million to $6 million. The court declined to disturb the punitive damage award, concluding Union Carbide's stipulated $4.2 billion net worth and the evidence concerning the reprehensibility of its conduct supported the amount of the award, notwithstanding the substantial reduction in compensatory damages. Plaintiffs accepted the remittitur and the court entered judgment against Union Carbide.

4

## DISCUSSION

1.      *Substantial Evidence Supports the Jury's Causation Finding*

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. . . .  [T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer."  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982-983, fn. omitted (*Rutherford*).)  We review a jury's causation finding for substantial evidence.  (*Jones v. John Crane, Inc*. (2005) 132 Cal.App.4th 990, 997-999.)

Union Carbide contends the jury necessarily speculated in finding Mr. Izell was exposed to Union Carbide asbestos and that the exposure contributed to his risk of developing mesothelioma.  We conclude the evidence of causation was sufficient.

            a.      *Substantial evidence supports the finding that Mr. Izell was exposed to asbestos supplied by Union Carbide*

"A threshold issue in asbestos litigation is exposure to the defendant's product."  (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1103 (*McGonnell*); *Rutherford, supra,* 16 Cal.4th at p. 982.)  It is axiomatic that, "[i]f there has been no exposure, there is no causation."  (*McGonnell,* at p. 1103.)  Further, "[t]he mere 'possibility' of exposure" is insufficient to establish causation.  (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 108; *Dumin v. Owens–Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650, 654-656 (*Dumin*).)  "[P]roof that raises mere speculation, suspicion, surmise, guess or conjecture is not enough to sustain [the plaintiff's] burden" of persuasion.  (*Ulwelling v. Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 104-105.)

5

In *McGonnell*, the court affirmed summary judgment in favor of the defendant, concluding the plaintiffs' limited circumstantial evidence was insufficient to establish more than the mere possibility that the decedent had been exposed to the defendant's asbestos-containing joint compound. In opposing summary judgment, the plaintiffs in *McGonnell* offered "invoices showing the sale of [the defendant's] joint compound to a contractor in 1972," which indicated the materials were purchased for a project at the decedent's workplace. (*McGonnell, supra,* 98 Cal.App.4th at p. 1105.) Based on this evidence, the *McGonnell* court acknowledged it was "at least within the realm of possibility" that the decedent "encountered a wall with [the defendant's] [asbestos-containing] joint compound during his 24 years of employment." (*Ibid.*) However, the court held this possibility alone was insufficient to create a triable issue of fact, because a finding of exposure would necessarily require "speculation that at some time [the decedent] might have cut into a wall that might have contained [the defendant's] joint compound that might have contained asbestos." (*Ibid*.) The *McGonnell* court concluded the evidence, viewed in the light most favorable to the plaintiffs, "create[d] only 'a dwindling stream of probabilities that narrow into conjecture,' " and thus summary judgment was properly granted. (*Ibid.*; accord *Dumin, supra,* 28 Cal.App.4th at p. 656 [affirming directed verdict where defendant's product "was only one of many asbestos insulation products used at the shipyard," such that a conclusion that plaintiff was exposed to defendant's product "would require a stream of conjecture and surmise"]; *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1094 [evidence that defendant specified asbestos insulation at plant in the 1950's was insufficient to create triable issue where plaintiffs submitted no evidence that "the asbestos-containing materials installed in the early 1950's were more likely than not still present when [decedent] was employed there" in 1961].)

Union Carbide contends the evidence in this case, as in *McGonnell*, established only the mere possibility that Mr. Izell was exposed to Union Carbide asbestos at some unspecified time during the 20-year period in question. In support of this contention, Union Carbide cites evidence indicating there were multiple asbestos suppliers for the

joint compound and gun plastic cement products that Mr. Izell remembers encountering at his jobsites. Thus, while Union Carbide concedes it supplied asbestos that could have been in one or all of these products, it argues the jury necessarily speculated in concluding Mr. Izell was more likely than not exposed to Union Carbide asbestos, as opposed to asbestos from one of the other suppliers.

As we shall explain, though we agree the evidence allowed only speculation with respect to the products manufactured by Kelly-Moore, Georgia Pacific, Kaiser Gypsum and Riverside, with respect to the Hamilton joint compound, we conclude the evidence was sufficient to permit a reasonable inference that Mr. Izell was exposed to Union Carbide asbestos.

(i)     *Kelly-Moore*

At trial, Plaintiffs presented a collection of invoices showing Union Carbide supplied Kelly-Moore's San Carlos, California plant with several hundred thousand pounds of raw asbestos from 1971 to 1976. However, the uncontradicted evidence established that Kelly-Moore had multiple asbestos suppliers during this time period, of which Union Carbide was only a minor supplier. Specifically, a former Kelly-Moore employee offered undisputed testimony that Union Carbide supplied only 8 percent of the asbestos Kelly-Moore purchased for its Paco Textures division—the division that manufactured the company's asbestos containing products—while Carey Canadian supplied 72 percent and Johns-Manville supplied 20 percent.[1]

---

[1]     Without disputing the numbers, Plaintiffs note these percentages are based on Kelly-Moore's "nationwide" asbestos purchases. The portion of the record cited by Plaintiffs says nothing about "nationwide" purchases. But even if the record supported Plaintiffs' assertion, this fact alone would not supplant the need for speculation, inasmuch as Plaintiffs, who bore the burden of proof on exposure, failed to present evidence showing how Kelly-Moore used or geographically distributed its various suppliers' asbestos.

7

Because the invoices show Union Carbide supplied asbestos to Kelly-Moore's San Carlos, California plant, Plaintiffs argue a reasonable inference, beyond speculation, can be drawn that joint compound containing Union Carbide asbestos made its way to one of the southern California jobsites where Mr. Izell inhaled dust from a Kelly-Moore product. We disagree. In view of the uncontested evidence that Kelly-Moore had multiple asbestos suppliers during the relevant time period, the fact that Union Carbide supplied asbestos to a plant in California does not remove the issue from the realm of speculation. As Union Carbide points out, Plaintiffs failed to show what percentage of the asbestos supplied to Kelly-Moore's San Carlos plant came from Union Carbide, as opposed to some other supplier, let alone that Kelly-Moore's Paco Textures division had other plants outside of San Carlos, California. Moreover, even if supplying Kelly-Moore's San Carlos plant enhanced the possibility that Union Carbide asbestos made its way to one of Mr. Izell's jobsites, this still leaves speculation about whether Mr. Izell was present when his workers sanded joint compound that might have contained Union Carbide asbestos, as opposed to asbestos from one of Kelly-Moore's other suppliers. (*McGonnell, supra,* 98 Cal.App.4th at p. 1105.)

(ii)     *Georgia Pacific*

Mr. Izell testified that he inhaled dust from Georgia Pacific Ready-Mix joint compound on jobsites in Southern California during the mid to late 1970's. He identified the Georgia Pacific joint compound as "a pasty thing"—i.e., the premixed compound— that came in five gallon buckets weighing 62.5 pounds. Plaintiffs contend the jury could have reasonably inferred that Mr. Izell was more likely than not exposed to Union Carbide asbestos from Georgia Pacific joint compound because the evidence showed that *all* Ready-Mix manufactured at Georgia Pacific's Acme, Texas plant between September 1971 and May 1977 contained Union Carbide asbestos. This assertion would have merit if the joint compound from the Texas plant had been the only premixed product that Georgia Pacific sold in California under the Ready-Mix brand during the relevant time period. The undisputed evidence established it was not.

8

Because Ready-Mix was "33 percent water" and "the freight on the water would make it uncompetitive" for Georgia Pacific to ship the product from Texas to California, the undisputed evidence showed that from 1968 to 1971, Georgia Pacific had a "formal rebranding agreement in which a Paco [Kelly-Moore] facility in California made . . . joint compounds and cements at their facility and put them in Georgia Pacific containers." After the rebranding agreement expired in 1971, Georgia Pacific's "individual distribution centers" in California were allowed to "purchase [rebranded Ready-Mix] from anybody they wanted," including Kelly-Moore. According to the uncontested testimony of a former Georgia Pacific employee, the reason for this distribution arrangement was the same as had motivated the former rebranding agreement—Georgia Pacific "couldn't get the product economically to California."

Plaintiffs argue the evidence was in conflict as to whether Ready-Mix joint compound from Georgia Pacific's Texas plant made its way to the Southern California market. They stress that, on appeal, this conflict must be resolved in favor of the jury's verdict.[2] However, even if we assume a genuine conflict exists, when viewed in the light most favorable to the judgment, the evidence still required the jury to speculate as to whether Mr. Izell might have inhaled dust from Ready-Mix joint compound manufactured at Georgia Pacific's Texas plant (where Union Carbide asbestos was used), or Kelly-Moore's California facility (where asbestos from multiple suppliers was used),

_____

[2]     To support this assertion, Plaintiffs rely exclusively on the testimony of their materials expert, Dr. William Longo, who claimed "I don't have the document in front of me, but California was one of the places it [Ready-Mix from the Texas plant] [was] sold." Dr. Longo admitted he lacked personal knowledge on the issue, and Plaintiffs did not offer the unidentified document he mentioned into evidence. Thus, were we to resolve the issue on this basis, we would conclude Dr. Longo's testimony is entitled to no weight and cannot alone support the judgment. (See *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 ["Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record"]; *Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1234 [expert declaration that did "nothing more than suggest the possibility of [asbestos] exposure without any basis in fact" properly excluded].)

9

or some other joint compound manufacturer that contracted with one of Georgia Pacific's individual distribution centers during the period. Absent a minimum evidentiary showing that Ready-Mix joint compound manufactured at Georgia Pacific's Texas plant was used on one of Mr. Izell's jobsites, the jury could only speculate as to whether Mr. Izell inhaled dust containing Union Carbide asbestos. (See *Dumin, supra,* 28 Cal.App.4th at p. 656.)

(iii) *Kaiser Gypsum and Riverside*

For the reasons already discussed with respect to Kelly-Moore and Georgia Pacific, we also conclude the evidence was insufficient to support anything more than speculation that Mr. Izell was exposed to Union Carbide asbestos from Kaiser Gypsum joint compound or Riverside gun plastic cement.

With respect to Kaiser Gypsum, the undisputed evidence showed that Kaiser Gypsum purchased asbestos from "many different suppliers," of which Carey Canadian and Johns-Manville were the two largest. As they did with Kelly-Moore, Plaintiffs offered Union Carbide invoices showing that it supplied several hundred thousand pounds of raw asbestos to a Kaiser Gypsum plant in southern California between 1970 to 1975—part of the period during which Mr. Izell testified he inhaled dust from Kaiser Gypsum joint compound. Plaintiffs, however, failed to offer evidence establishing that Union Carbide was the exclusive asbestos supplier for this plant, let alone evidence showing that joint compound from this plant found its way to one of Mr. Izell's jobsites.

The evidence was even more speculative with respect to Riverside gun plastic cement. The parties stipulated that Union Carbide was a minority supplier to Riverside during only one year—1978—and Mr. Izell testified he saw workers dump Riverside gun plastic cement into a mixer in the "late '70s." Even if we accept as a reasonable inference from this testimony that Mr. Izell inhaled dust from Riverside gun plastic cement in 1978, there still is no evidence establishing this dust contained asbestos from Riverside's "minority supplier"—Union Carbide—as opposed to any of its larger suppliers. Any finding of exposure based on this evidence would have been speculative. (*Dumin, supra,* 28 Cal.App.4th at p. 656.)

10

(iv)  *Hamilton*

In contrast to the foregoing, the evidence adduced with respect to Hamilton supported a reasonable inference that Union Carbide was Hamilton's exclusive asbestos supplier during the time period when Mr. Izell inhaled dust from Hamilton Red Dot joint compound.  Hamilton's president, Willis Hamilton, testified that, from the 1960's through 1977, all of Hamilton's taping and embedding joint compound contained asbestos.  Mr. Hamilton also affirmed that, during this same period, the asbestos used to make Hamilton's joint compound was "*all* Union Carbide."  (Italics added.)

As for exposure, Mr. Izell testified that, apart from Georgia Pacific, which was the dominate joint compound seller at that time, he most frequently encountered "Hamilton Red Dot" joint compound on his jobsites.  Hamilton described its Red Dot product as an " 'All Purpose Joint System.' "  Mr. Izell testified that his workers used the joint compound to fill in seams between sections of drywall, cover nail heads, and fill in corner sections.  When the joint compound dried, the workers sanded it, dispersing a "fog" of dust into the air.  Mr. Izell testified that he inhaled dust from Hamilton Red Dot joint compound during the mid to late 1970's.  Coupled with Mr. Hamilton's testimony, this evidence was sufficient to support a reasonable inference that Mr. Izell more likely than not inhaled Union Carbide asbestos.

Union Carbide argues Mr. Hamilton's "memory was too faulty" to credit his testimony that Union Carbide was ever Hamilton's exclusive asbestos supplier.  In support of the contention, Union Carbide cites its own records as evidence that it did not start selling asbestos to Hamilton until *1974*, which it argues undisputedly refutes Mr. Hamilton's testimony that his company used "all Union Carbide" asbestos in its "joint taping compound *from the 1960's through [the] 1970's*."  (Italics added.)  Union Carbide also points out that when Mr. Hamilton was asked about these records, he conceded he could not recall when Hamilton started purchasing asbestos from Union Carbide.

Though the foregoing discrepancies suggest that Mr. Hamilton's memory was not perfect, Union Carbide's objection concerns only his credibility and the weight of his testimony—not the sufficiency of the evidence.  (See *Wright v. Best* (1942) 19 Cal.2d

11

368, 379-380 ["inconsistencies" evidencing "a faulty memory . . . do not go to the admissibility or sufficiency of the evidence, but rather to the weight of the testimony and the credibility of the witnesses, matters wholly within the exclusive province of the trier of fact, whose determination upon them will not be disturbed by an appellate court"].) While the jury could have entirely disregarded Mr. Hamilton's testimony based on these inconsistencies, it also could reasonably have inferred that he was confused about the start date, but correct in his recollection that Union Carbide became his company's exclusive supplier once it started selling asbestos to Hamilton.[3]

Union Carbide also contends it is speculative whether Mr. Izell ever inhaled asbestos from a Hamilton product, because the evidence showed that, in addition to its asbestos-containing joint compound, Hamilton also sold a drywall topping compound that did not contain asbestos. The record does not support this contention. Though there was evidence of Hamilton's asbestos-free topping compound, there was no evidence that it ever was used on any of Mr. Izell's jobsites. Mr. Izell's testimony exclusively concerned Hamilton's Red Dot all purpose joint compound, which his workers used to fill in seams, cover nail heads, and fill corner sections of drywall—functions that cannot be performed with a topping compound due to its lower adhesive content.[4] Mr. Izell never mentioned Hamilton's topping compound, and Union Carbide made no attempt to elicit this testimony from him.

---

[3] For the same reason, Mr. Hamilton's testimony that his company had other asbestos suppliers "from the 1960's and 1970's" did not compel a finding that Union Carbide never became Hamilton's exclusive supplier. The jury could have concluded that Hamilton had other suppliers in the 1960's and 1970's, but those relationships ended once Hamilton began purchasing asbestos from Union Carbide in 1974—just around the mid to late 1970's when Mr. Izell testified he inhaled dust from Hamilton Red Dot joint compound.

[4] In contrast to a joint compound, which must be used to fill in seams and cover nail heads, the evidence showed that a topping compound has less adhesive. Thus, it is customarily used on top of joint compound for finishing, as it is easier to sand.

12

Viewed in the light most favorable to the judgment, the evidence was sufficient to support a finding that Mr. Izell was exposed to Union Carbide asbestos when he inhaled dust from Hamilton Red Dot joint compound.

        b.      *Substantial evidence supports the finding that Union Carbide's asbestos was a substantial factor in increasing Mr. Izell's risk of developing mesothelioma*

In addition to establishing "some threshold *exposure* to the defendant's defective asbestos-containing products," a plaintiff in an asbestos-related cancer case "must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial* factor in bringing about the injury." (*Rutherford, supra,* 16 Cal.4th at p. 982.)  However, "given the long latency period of asbestos-related disease, and the occupational settings that commonly exposed the worker to multiple forms and brands of asbestos products with varying degrees of toxicity," our Supreme Court has held that a plaintiff "need *not* prove with medical exactitude that fibers from a particular defendant's asbestos-containing products were those, or among those, that actually began the cellular process of malignancy." (*Id*. at pp. 957-958.)  Rather, a "plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer." (*Id.* at pp. 982-983.)

As our Supreme Court explained in *Rutherford,* "[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford, supra,* 16 Cal.4th at p. 978.)  Thus, "[a] plaintiff who suffers from an asbestos-related cancer and has proven exposure to inhalable asbestos fibers from several products will not, generally speaking, face insuperable difficulties in convincing a jury that a particular one of these product exposures, or several of them, were substantial factors in creating the risk of asbestos disease or latent injury." (*Ibid.*)  Under *Rutherford*, a plaintiff is free to "establish that his particular asbestos disease is cumulative in nature, with many separate exposures each

having constituted a 'substantial factor' [citation] that contributed to his risk of injury," and "a defendant cannot escape *liability* simply because it cannot be determined with medical exactitude the precise contribution that exposure to fibers from defendant's products made to plaintiff's ultimate contraction of asbestos-related disease . . . ." (*Id.* at p. 958.)

Union Carbide contends Plaintiffs' medical evidence was inadequate to establish legal causation under the *Rutherford* test. In particular, Union Carbide emphasizes the following testimony by Plaintiffs' medical expert, Dr. Eugene Mark, which it claims improperly conflates a threshold showing of exposure with proof of legal causation:

> **Question:** "If [Mr. Izell] was exposed to asbestos supplied by Union Carbide that went into some of these various asbestos-containing joint compounds, would the Union Carbide asbestos . . . have been a contributing cause of his mesothelioma as well?"
>
> **Answer:** "All of the asbestos together contributes to cause mesothelioma. The asbestos fibers don't come into the body labeled Union Carbide. They come in as asbestos fibers with certain physical, chemical, and biological principles. And those asbestos fibers, all of them together in total, contributed to cause this disease." (Italics added.)

Union Carbide asserts the foregoing testimony cannot be squared with *Rutherford's* two-step causation test. Under Dr. Mark's approach, Union Carbide argues, "it is only the first step—proof of exposure—that matters, because every exposure contributes to the overall increase in risk"; thus, "[t]he second step would be wholly unnecessary, since proof of exposure automatically equates with proof that the exposure constituted a 'substantial factor.' " This argument does not withstand scrutiny.

To begin, the purported fallacy Union Carbide claims—that the "second step [of the *Rutherford* test] would be wholly unnecessary" under Dr. Mark's approach— disregards the fact that Dr. Mark's expert medical testimony *is* the evidence that satisfies *Rutherford's* second step. In other words, proof of exposure establishes legal causation

14

only if the jury accepts Dr. Mark's expert medical testimony that all exposures constitute a substantial factor contributing to the risk of developing mesothelioma. This is not inconsistent with *Rutherford's* two-step causation test. Nothing in *Rutherford* precludes a plaintiff from establishing legal causation through opinion testimony by a competent medical expert to the effect that every exposure to respirable asbestos contributes to the risk of developing mesothelioma. On the contrary, *Rutherford* acknowledges the scientific debate between the "every exposure" and "insignificant exposure" camps, and recognizes that the conflict is one for the jury to resolve. (See *Rutherford, supra,* 16 Cal.4th at pp. 984, 985 [discussing jury's resolution of conflict between defense expert opinion that "a very light or brief exposure could be considered 'insignificant or at least nearly so' " in assessing increased risk of cancer and plaintiffs' expert's contrary opinion that "each exposure, even a relatively small one, contributed to the occupational 'dose' and hence to the risk of cancer"; noting jury "rejected defendant's argument that such a small contribution should be considered insubstantial"].)[5]

In any event, Union Carbide's argument ignores the distinction Dr. Mark drew between significant exposures that contributed to Mr. Izell's risk of contracting the disease and "trivial exposures" that would not have been substantial factors increasing his risk. In particular, Dr. Mark testified that asbestos fibers had to be "respirable and put into the air" and Mr. Izell needed to have "breathed it in" for the exposure to constitute a "substantial contributing factor" toward his mesothelioma. In contrast, Dr. Mark testified that if Mr. Izell had been exposed to asbestos in a "wet slurry" this would be a "trivial exposure, and I would not be able to say that that was a contributing factor." Contrary to Union Carbide's characterization, Dr. Mark did not opine that every exposure constituted

---

5       Similar to the defense expert in *Rutherford*, Union Carbide's expert testified that some asbestos exposures, such as earlier ones, create a greater risk of developing mesothelioma, while exposure to Union Carbide's chrysotile asbestos creates no risk at all. As in *Rutherford*, the jury here could resolve the conflict between the competing expert opinions and conclude, based on Dr. Mark's testimony, that even a single exposure to respirable asbestos fibers was a substantial factor in increasing Mr. Izell's risk of developing mesothelioma.

15

a substantial factor. Rather, he testified that only those exposures in which the asbestos-containing product was "dry enough so that asbestos fibers could be released into the air," and the asbestos became "airborne" and Mr. Izell "breathed it in" would be significant enough to contribute to his risk of contracting cancer.

As discussed above, Plaintiffs presented sufficient evidence for the jury to conclude that Mr. Izell was exposed to Union Carbide asbestos contained in Hamilton Red Dot joint compound. Mr. Izell testified that he not only saw his workers apply Hamilton Red Dot in its wet form, but he also watched them sand the dried product, and inhaled the resulting dust when it became airborne. Viewed in the light most favorable to the judgment, this evidence, coupled with Dr. Mark's expert testimony, is sufficient to establish in reasonable medical probability that exposure to Union Carbide asbestos was a substantial factor contributing to Mr. Izell's risk of contracting mesothelioma. (See *Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 676 [testimony regarding "dust which would become airborne and settle on [the plaintiff's] face" and expert testimony "suggesting that if an individual is exposed to many different asbestos-containing products, each of those products would contribute to an increased risk of asbestos-related disease, as long as the asbestos was inhaled and retained in the worker's body" held sufficient to establish legal causation under *Rutherford*].)[6]

---

[6] Indeed, the evidence in this case, including Dr. Mark's expert medical testimony, was substantively similar to the evidence presented at trial in *Rutherford*. In *Rutherford*, the plaintiffs' causation showing included factual evidence of the decedent's exposure to the defendant's product, expert testimony from an epidemiologist who opined as to the cause of mesothelioma generally, and expert medical testimony on the relationship between asbestos exposure and lung cancer. Specifically, the plaintiffs' medical expert, like Dr. Mark, offered an opinion "to the effect that each exposure, even a relatively small one, contributed to the occupational 'dose' and hence to the risk of cancer." (*Rutherford, supra,* 16 Cal.4th at p. 984.) The Supreme Court held this evidence was sufficient for a jury to determine legal causation. (*Id.* at p. 985.)

16

2.    *Substantial Evidence Supports the Jury's Apportionment of Comparative Fault*

After making liability findings as to each defendant, the jury was asked in the special verdict form to assign "a percentage of responsibility" to those defendants found liable for Plaintiffs' injuries and "those entities or product descriptions named on the chart below that you determine contributed to Bobbie Izell's harm." In addition to the five defendants and Mr. Izell, the chart listed six other entities that were not parties to the trial—three joint compound manufacturers (Georgia Pacific, Hamilton, and Kelly-Moore), two asbestos suppliers (Carey Canadian and Johns-Manville), and an unnamed asbestos-cement pipe manufacturer. The verdict form instructed the jury that the "total of your apportionment must equal 100%." (Boldface omitted.)

The jury apportioned 65 percent fault to Union Carbide, 20 percent to Kaiser-Gypsum, 10 percent to the three other defendants, and one percent fault to each of the five non-defendant joint compound manufacturers and asbestos suppliers. The jury apportioned no fault to the unnamed asbestos-cement pipe manufacturer or Mr. Izell. Union Carbide contends the jury's allocations are not supported by substantial evidence. We disagree.

"On review for substantial evidence, we 'consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. [Citation.]' [Citation.] Under this standard, ' "the appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment. [Citation.]" ' " (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1286 (*Pfeifer*).)

As discussed above, the evidence established Union Carbide asbestos was a legal cause of Plaintiffs' injuries. Thus, under established law, Union Carbide " 'undisputedly had the burden to establish concurrent or alternate causes by proving: that [Mr. Izell] was exposed to defective asbestos-containing products of other companies; that the defective designs of the other companies' products were legal causes of the plaintiffs' injuries; and

17

the percentage of legal cause attributable to the other companies.' " (*Stewart v. Union Carbide Corp.* (2010) 190 Cal.App.4th 23, 33 (*Stewart*).)  In the absence of such proof, or if the jury's finding is supported by any reasonable view of the evidence, the comparative fault allocation cannot be disturbed.  (See *Pfeifer, supra,* 220 Cal.App.4th at p. 1286 [absent evidence "quantifying [plaintiff's] exposure to asbestos from the other sources . . . the jury reasonably allocated a 70 percent share of comparative fault to [appellant]"].)

### a. *The asbestos-cement pipe manufacturer*

Union Carbide argues the jury's allocation of zero percent fault to the asbestos-cement pipe manufacturer cannot be squared with the evidence or Plaintiffs' theory of causation in this case.  Union Carbide relies on Mr. Izell's testimony that he "chiseled" cement pipe and "busted it up" while working on construction projects "during the '60s and '70s," coupled with testimony by Plaintiffs' materials expert, Dr. William Longo, that chiseling cement pipe would result in exposure to "elevated levels of crocidolite asbestos fibers."  Union Carbide contends "this evidence strongly suggests that exposure to asbestos-cement pipe played a major role in causing Mr. Izell's disease," and, in view of Plaintiffs' purported theory that "*any* exposure, however small, contributes to the overall dose," required the jury to allocate some portion of fault to the cement pipe manufacturer.

As we explained in connection with our discussion of causation, Plaintiffs' medical expert did not testify, as Union Carbide suggests, that "*any* exposure" constitutes a substantial factor toward increasing the risk of contracting mesothelioma.  Rather, Dr. Mark testified the asbestos fibers had to be "respirable and put into the air" and Mr. Izell needed to have "breathed [them] in" for the exposure to constitute a "substantial contributing factor."  Though Dr. Longo's testimony concerning "elevated levels" might have supported an inference that chiseling cement pipe put respirable asbestos fibers into the air, this evidence did not require the jury to find that Mr. Izell inhaled asbestos fibers when performing this work.

18

For its part, Union Carbide did not question Mr. Izell about his cement pipe exposure. It elicited no testimony concerning the conditions under which he worked with the cement pipe—such as whether he wore a mask or took other protective measure—nor did it confirm, in contrast to the evidence concerning Mr. Izell's exposure to joint compound, that he inhaled dust from the cement pipe. Absent such evidence, the jury was free to find that Mr. Izell's admitted exposure to asbestos-cement pipe was not a legal cause of his injuries.[7] (See *Stewart, supra,* 190 Cal.App.4th at p. 33 [despite plaintiff's admission that he was exposed to asbestos from many sources, jury reasonably allocated 85 percent share of comparative fault to Union Carbide where it submitted no evidence detailing plaintiff's exposure from other sources]; *Sparks v. Owens–Illinois, Inc.* (1995) 32 Cal.App.4th 461, 477-479 [jury reasonably found that defendant's asbestos-based product was sole cause-in-fact of plaintiff's mesothelioma when defendant submitted no evidence specifying extent of plaintiff's exposure to asbestos from other manufacturers' products].)

      b.    *The asbestos suppliers*

Union Carbide contends the jury's allocation of 65 percent fault to it, but only one percent fault to Johns-Manville and Carey Canadian, was "disproportionate and unsupported," given evidence that Johns-Manville was the "biggest" and Carey Canadian was "a large" asbestos supplier. Additionally, Union Carbide emphasizes that Mr. Izell

---

[7]     Union Carbide also challenges the trial court's exclusion of an interrogatory response in which Mr. Izell stated he had been "exposed to CertainTeed's asbestos cement pipe throughout the 1960's and 1970's" and "personally used and was exposed, as well as personally supervised in his general contractor supervisory role, to CertainTeed's asbestos cement pipe when it was chiseled, sawed and otherwise destroyed." The trial court excluded the response because it concerned a defendant—CertainTeed—that had been granted summary judgment, and the parties had stipulated, consistent with Code of Civil Procedure section 437c, subdivisions (n)(1) and (3), that CertainTeed would not be mentioned at trial. We find no abuse of discretion. Moreover, insofar as the interrogatory response did nothing to fill the evidentiary void concerning whether Mr. Izell actually inhaled respirable asbestos while working with cement pipe, Union Carbide was not prejudiced by the ruling.

claimed he was exposed to asbestos in joint compound throughout the 1960's and 1970's, while it did not begin selling asbestos for use in joint compound until 1967. Thus, Union Carbide argues, even if Mr. Izell was exposed to some of its asbestos, "the overwhelming evidence is that he was exposed to far more asbestos supplied by Johns-Manville and Carey [Canadian]."

In view of the date Union Carbide entered into the joint compound market, it is reasonably likely that Mr. Izell was exposed to asbestos from other suppliers. But this fact alone does not require, or even necessarily support, an inference that Mr. Izell was exposed to asbestos from Johns-Manville or Carey Canadian or some other asbestos supplier. Once Plaintiffs established Union Carbide asbestos was a legal cause of Mr. Izell's injury, Union Carbide had the burden to establish concurrent or alternate causes by proving that Mr. Izell was exposed to another supplier's asbestos, that the exposure was a legal cause of his injuries, and the " 'percentage of legal cause attributable to the other [supplier].' " (*Stewart, supra,* 190 Cal.App.4th at p. 33.) As Union Carbide has argued, this required proof, beyond speculation, that Mr. Izell inhaled dust containing Johns-Manville or Carey Canadian asbestos before significant fault could be allocated to either of these companies. (*Ibid.*; *McGonnell, supra,* 98 Cal.App.4th at p. 1105; *Dumin, supra,* 28 Cal.App.4th at p. 656.)

In contrast to the evidence demonstrating that Union Carbide was Hamilton's exclusive asbestos supplier when Mr. Izell inhaled dust from Red Dot joint compound, there was no evidence of an exclusive relationship between Johns-Manville or Carey Canadian and any joint compound manufacturer. As Union Carbide argues in its opening brief, without proof that either entity was "the sole asbestos supplier to *any* of the manufacturers," establishing exposure beyond speculation required it "to prove not only that Mr. Izell came into contact with specific asbestos-containing products, but also that the asbestos in those products *was supplied by [Johns-Manville or Carey Canadian]*, rather than another asbestos supplier." In allocating only nominal fault to these entities, the jury apparently determined Union Carbide did not carry its burden. This was not an unreasonable finding based on this record. (*Stewart, supra,* 190 Cal.App.4th at p. 33.)

20

### c. *The joint compound manufacturers*

Union Carbide contends there is "no evidence" supporting the jury's allocation of three percent total fault to the non-defendant joint compound manufacturers (Georgia Pacific, Hamilton, and Kelly-Moore), versus 20 percent fault to Kaiser Gypsum. In view of Mr. Izell's testimony that he recalled seeing Georgia Pacific and Hamilton joint compound on his jobsites more frequently than Kaiser Gypsum, Union Carbide argues the jury was compelled to allocate a greater proportion of comparative fault to these entities—because, if Kaiser Gypsum joint compound was defective, then "so too were the asbestos-containing joint compounds sold by the other manufacturers."

The court in *Pfeifer* rejected a similar argument, reasoning the jury was permitted to consider the egregiousness of a defendant's conduct in apportioning the defendant a greater share of comparative fault for the plaintiff's injuries. In that case, the defendant asbestos supplier, JCI, challenged the jury's finding allocating it 70 percent of the fault for the plaintiff's cancer, versus only 12.5 percent for the Navy. (*Pfeifer, supra,* 220 Cal.App.4th at pp. 1286, 1289.) JCI argued the evidence compelled a larger allocation of fault for the Navy, because the duration of plaintiff's Naval service accounted for nearly half his exposure to asbestos-containing products. (*Id.* at p. 1289.) The *Pfeifer* court rejected JCI's argument, holding "the jury was permitted to increase JCI's share of liability because it determined that JCI's misconduct was more egregious than the Navy's misconduct." (*Ibid.*) The court explained, "the evidence supported the inference that JCI was consciously indifferent to the dangers that its products posed to consumers [citation], while the Navy was merely negligent regarding those dangers during [the plaintiff's] period of service [citation]. The evidence was thus sufficient to support the jury's allocation of comparative fault, in view of the differences in the length and gravity of JCI's and the Navy's misconduct." (*Id.* at pp. 1289-1290.)

So too here, the evidence supported an inference that Kaiser Gypsum's conduct was more egregious than that of the other joint compound manufacturers, and the jury found Kaiser Gypsum acted with "malice, oppression or fraud." (Boldface omitted.) In 1965, an internal Kaiser Gypsum memorandum detailed studies linking asbestos

inhalation to lung cancer and mesothelioma, and advised Kaiser Gypsum employees to "use a respirator with a filter especially designed for asbestos dust." Notwithstanding these internal measures, the evidence also showed that as late as 1970, Kaiser Gypsum's sales staff was advised to tell customers that "there was no asbestos in Kaiser Gypsum's products." And, the evidence showed the sales staff carried this message to customers because, as one Kaiser Gypsum sales person put it, "[i]f you had asbestos in your product[,] it would be negative towards sales." The evidence was sufficient to support the jury's allocation of greater fault to Kaiser Gypsum, given the gravity of its misconduct. (*Pfeifer, supra,* 220 Cal.App.4th at p.1290; see also *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 742 [observing principles of comparative fault "elevate justice and equity above the exact contours of a mathematical equation"].)

3. *Substantial Evidence Supports the Amount of Compensatory Damages after Remittitur*

We next consider Union Carbide's contention that the compensatory damages award, in the remitted amount of $6 million for Mr. and Mrs. Izell's past and future noneconomic damages and loss of consortium is excessive and unsupported by the evidence. We begin with the well-settled principles that prescribe our circumscribed scope of review.

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507 (*Seffert*).)

22

" '[W]here the trial court has required a remission as a condition to denying a new trial "a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount." [Citations.]' " (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 877 (*West*).) "If the award appears excessive as a matter of law, . . . the reviewing court has a duty to act in order to correct the injustice." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1213.) "The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule . . . .' [Citation.] All presumptions favor the trial court's determination [citation], and we review the record in the light most favorable to the judgment [citation]." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259.)

In the instant case, the trial court's statement of decision thoughtfully sets forth the competing evidence, the court's observations of the witnesses' demeanor, and the court's factual findings supporting its reduction of compensatory damages to $6 million. Accordingly, we quote the trial court's decision in its entirety:

"Bobbie Izell, age 86 at the time of trial, was diagnosed with mesothelioma in July of 2011, approximately 11 months before the trial. He and his wife Helen had been married for 65 years, and were living comfortably in retirement near family. Bobbie Izell, who had a successful career in building and selling homes, was diagnosed with mesothelioma, a fatal lung disease, during a doctor visit for an unrelated ailment. He had liters of fluid drained from his lungs.

"Mr. Izell was not terribly expressive about the effect of his diagnosis and disease at the time of trial. Much of the evidence concerning the effect of the disease came from Mrs. Izell. From their combined testimony, there was evidence that Mr. Izell became very depressed after the diagnosis, and went through a 'real bad spell.' Mrs. Izell had to work all the time to lift his spirits. She described how Mr. Izell would try to hide

23

his feelings from the outside world; however, she knew him well enough to see the pain he was feeling inside. Mrs. Izell testified that Mr. Izell had experienced grief, anxiety, and emotional problems since his diagnosis.

"Physically, Mr. Izell became increasingly reliant on a walker. At the time of trial, Mr. Izell walked with a cane with much difficulty. At times Mr. Izell would fall if he did not have something for support, and one time fell onto a barbed wire fence. His energy level was low. He would go back to bed after breakfast, wake up in time for lunch, and go back to bed. He had difficulty speaking at times, with his voice 'giving way.' Mr. and Mrs. Izell could not do the things they used to do before the diagnosis.

"There was testimony regarding the expected course of the disease from Dr. Eugene Mark, a medical doctor and professor of pathology at Harvard Medical School. He described how the disease will inevitably spread into the chest and cover the lung. It will grow into the lung and chest wall. The severe pain will require pain medication. [Mr. Izell] will lose his appetite and weight, experience depression, and pass away. He could expect to live another 2 to 3 years. Mrs. Izell, of course, would experience his demise right along with him.

"Defendants rightly point out countervailing evidence concerning damages. Mr. Izell's hospital visit was due to a fall on a nail, not from any symptoms related to the disease. Mr. Izell had other infirmities as well as his lung disease. He had arthritis in his joints, and had had falls before his diagnosis, and had used a walker in the past. He had kidney problems, gout, and hypertension. He was able to participate in activities that did not require a great deal of physical efforts, such as gardening and watching television. These were all factors for the jury to consider in determining damages for both Mr. and Mrs. Izell.

24

"Based on this evidence, the award of damages for past noneconomic losses of $5,000,000 and future noneconomic losses of $10,000,000 each was clearly excessive. This does not mean, however, that the evidence did not support a significant award. For a man of Mr. Izell's age, his normal life expectancy would have been an additional 5 years. At the time of trial his life expectancy was 2 to 3 years. The jury was charged with the responsibility of determining the effects on Mr. and Mrs. Izell of living with what is, in essence, a death sentence, with an inevitable painful demise. The jury had the opportunity to hear and evaluate the testimony, and to determine the consequences of the disease. Based on the evidence, and reasonable inferences that could be drawn therefrom, the Court finds that an award of past noneconomic damages in the sum of $1,000,000 and future noneconomic damages of $2,000,000, as to each plaintiff, is fair and reasonable."

In its briefs, Union Carbide largely ignores our presumption of correctness by downplaying the evidence that supports the trial court's findings, while highlighting the "countervailing" evidence the court thoughtfully considered in significantly reducing the jury's award. For instance, Union Carbide acknowledges "Plaintiffs are right that . . . Mr. Izell had fluid drained from his lungs," but emphasizes "he had no chemotherapy or surgery." It continues, "Plaintiffs are also right that Mr. Izell testified that his voice was sometimes weaker and he used his walker more after his diagnosis," but stresses "it is also undisputed that Mr. Izell was 85 when diagnosed and suffering from a number of unrelated infirmities, . . . which had already caused him to use a walker." With respect to Mrs. Izell's loss of consortium damages, Union Carbide contends "[t]here was no evidence in her scant 10-pages worth of testimony to suggest that Mrs. Izell had suffered physical or emotional injuries as a result of her husband's diagnosis," noting "[s]he testified that her husband still helped around the house and showed affection for her after his diagnosis."

The trial court's statement of decision adequately resolves the conflicting evidence Union Carbide seeks to relitigate on appeal, and the court's thorough discussion of the evidence and witnesses' demeanor fully dispels any suggestion that Mr. and Mrs. Izell have not suffered significant physical and emotional anguish since learning of Mr. Izell's cancer. Though we recognize the remitted amount remains on the high-end of noneconomic damage awards discussed in reported mesothelioma decisions—particularly for plaintiffs of the Izells' advanced age—this alone is not sufficient to second guess the trial judge, who presided over the four-week trial and personally observed "the injury and the impairment that has resulted."[8] (*Seffert, supra,* 56 Cal.2d at pp. 506-507; *Daggett v. Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 ["While a reviewing court, in passing upon the question [of excessive damages], may consider amounts awarded in similar cases [citations], in the final analysis the question in each case must be determined from its own peculiar facts and circumstances [citation] and it cannot be held as a matter of law that a verdict is excessive simply because the amount may be larger than is ordinarily allowed in such cases."].)

---

[8] We also reject Union Carbide's assertion that the jury's "passion or prejudice" with respect to compensatory damages, necessarily infected its liability and comparative fault determinations. Even if an excessive damage award is the product of passion and prejudice, it does not necessarily follow that the verdict as to liability was similarly influenced. (*West, supra,* 174 Cal.App.3d at pp. 876-877; *Sharp v. Automobile Club of So. Cal.* (1964) 225 Cal.App.2d 648, 652-653.) As we have discussed, substantial evidence supports the liability and comparative fault findings. Further, given our conclusion that the evidence supports the trial court's remitted compensatory damage award, we need not consider Union Carbide's contentions concerning the improper closing argument by Plaintiffs' counsel. In view of the court's thorough discussion of the evidence, we are confident the trial judge was not swayed by counsel's entreaties to "make a difference."

26

4.    *The Punitive Damage Award Is Not Unconstitutionally Excessive*

Lastly, Union Carbide contends the $18 million punitive damage award is unconstitutionally excessive when compared to its 65 percent share of the reduced $6 million compensatory damage award.  Reviewing this contention under the following well-established principles, we cannot conclude the award was unconstitutionally arbitrary in relation to the reprehensibility of Union Carbide's conduct and the magnitude of harm suffered by Plaintiffs.

Punitive damages may be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition.  (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 (*Gore*).)  The amount of punitive damages offends due process under the Fourteenth Amendment as arbitrary only if the award is " 'grossly excessive' " in relation to the state's legitimate interests in punishment and deterrence. (*Id.* at p. 568; see also *State Farm Mut. Ins. v. Campbell* (2003) 538 U.S. 408, 416-417 (*State Farm*).)

A court determining whether a punitive damages award is excessive under the due process clause must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  [Citation.]" (*State Farm, supra,* 538 U.S. at p. 418.)  The defendant's financial condition also is a permissible consideration under the due process clause in determining the amount of punitive damages necessary to further the state's legitimate interests in punishment and deterrence.  (*Simon v. San Paolo U.S. Holding Co., Inc*. (2005) 35 Cal.4th 1159, 1185-1186 (*Simon*).)

On appeal, we defer to findings of fact if they are supported by substantial evidence, and we independently assess each of the three guideposts to determine de novo whether the punitive damages award is excessive under the due process clause. (*State Farm, supra,* 538 U.S. at p. 418; *Cooper Ind., v. Leatherman Tool Grp.* (2001) 532 U.S. 424, 436; *Simon, supra,* 35 Cal.4th at p. 1172 & fn. 2.) The reviewing court's "constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the 'right' level in the court's own view. While we must . . . assess independently the wrongfulness of a defendant's conduct, our determination of a maximum award should allow some leeway for the possibility of reasonable differences in the weighing of culpability. In enforcing federal due process limits, an appellate court does not sit as a replacement for the jury but only as a check on arbitrary awards." (*Simon,* at p. 1188.)

a. *The reduction in the compensatory award did not mandate retrial of punitive damages*

Before examining the *State Farm* guideposts, we first will address Union Carbide's contention that, "given the dramatic reduction in compensatory damages, California law required the trial court either to grant a new trial . . . or to reduce the punitive damages to the level the jury selected." In support of this argument, Union Carbide principally relies upon *Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208 (*Frommoethelydo*) and *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172 (*Auerbach*).

In *Frommoethelydo*, the plaintiff obtained a judgment for $15,271 in general damages, $250,000 for emotional distress, and $1.25 million for punitive damages in an action for misconduct by an insurer in dealing with a claim for stolen property. (*Frommoethelydo, supra,* 42 Cal.3d at p. 211.) Our Supreme Court held the plaintiff could not recover emotional distress or general damages that were based on the insurer's privileged report of plaintiff's claim to the Bureau of Fraudulent Claims, and reduced the compensatory award from $265,271 to $8,771. (*Id.* at pp. 211, 220.) Then, citing the rule requiring reasonable proportionality between punitive and compensatory damages

28

(see *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928), the *Frommoethelydo* court held "[t]he award of punitive damages may not be upheld since most of the compensatory damages must be set aside." (*Frommoethelydo,* at p. 220.)

In *Auerbach*, a jury found the defendant bank liable on contract and fraud claims and awarded the plaintiff $207,155 for each, together with $2.6 million in punitive damages. (*Auerbach, supra*, 74 Cal.App.4th at p. 1184.) The Court of Appeal reversed the judgment on the contract claim and held the recoverable compensatory damages on the fraud claim were limited to $6,750. (*Id*. at pp. 1189, 1192.) The court then addressed the punitive damages award, stating, "We cannot . . . simply reduce the damages and modify the award on the fraud cause of action at this stage. Because the jury was misled about the amount of compensatory damages it could award, its punitive damage award is suspect. Although there is no fixed ratio, punitive damages must be proportional to recoverable compensatory damages. [Citation.] Because the punitive damages are out of proportion to the actual damages suffered by the [plaintiffs], the punitive damage claim will have to be retried." (*Id*. at p. 1190.)

Union Carbide contends *Frommoethelydo* and *Auerbach* draw a bright line rule requiring a new trial on punitive damages whenever a compensatory damage award is "dramatically reduced." We read these cases differently. Contrary to the rule advanced by Union Carbide, the courts' focus in *Frommoethelydo* and *Auerbach* was not simply on the magnitude of the compensatory damage reduction, but rather on the effect the reduction had on the proportionality between compensatory and punitive damages.

In *Frommoethelydo*, after the Supreme Court set aside most of the compensatory damages, the resulting ratio of punitive to compensatory damages was 142.5 to 1. Similarly in *Auerbach*, after the Court of Appeal's reduction, the resulting ratio of the jury's punitive damage award to the reduced compensatory damages was 385 to 1. The United States Supreme Court has held "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." (*State Farm, supra,* 538 U.S. at p. 425.) Likewise, our Supreme Court stated that ratios significantly greater than 9 or 10 to 1 raise a "presumption" of invalidity. (*Simon, supra,* 35 Cal.4th at

29

p. 1182.) Although *Frommoethelydo* and *Auerbach* did not expressly rely on constitutional standards in reversing the punitive damage awards, it is clear that such grossly disproportionate awards could not withstand constitutional scrutiny.[9] (See *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 536-537 [rejecting contention that "an award of punitive damages must be reversed and retried whenever the Court of Appeal reduces an award of compensatory damages"].)

Here, the ratio of the jury's punitive damage award to Union Carbide's share of compensatory damages (after the trial court's reduction) is 4.62 to 1. As this ratio is not presumptively invalid, we must assess Union Carbide's due process challenge under the *State Farm* guideposts.

> b. *The punitive damage award withstands constitutional scrutiny under the State Farm guideposts*

Union Carbide argues the punitive damage award is unconstitutionally excessive under two of the three *State Farm* guideposts—the degree of reprehensibility of the defendant's misconduct and the relationship between the punitive damage award and the harm suffered by the plaintiff. We conclude the award is constitutional under each guidepost.

---

[9]     The other cases cited by Union Carbide similarly recognize that punitive damages must be reasonably proportionate to the harm suffered, and thus hold, if compensatory damages are to be retried, punitive damages must be retried too. (See *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284 [when a trial court has "granted a new trial on the issue of compensatory damages" "[e]xemplary damages must be redetermined as well"]; *Ramona Manor Convalescent Hospial v. Care Enterprises.* (1986) 177 Cal.App.3d 1120, 1144 [reversing judgment on "the issue of damages with directions to the trial court to set the matter for retrial as to the issue of damages, both compensatory and punitive"]; see also *Service Employees Internat. Union, Local 250 v. Colcord* (2008) 160 Cal.App.4th 362, 375 ["because the trial court based the amount of punitive damages that it assessed against [the defendant], in part, on the aggregate amount of compensatory damages awarded, the court, on remand, should have an opportunity to reconsider the amount of this punitive damage award if it chooses to do so"].)

(i)  *Degree of reprehensibility*

The degree of reprehensibility of the defendant's conduct is the most important indicator of the reasonableness of a punitive damages award.  (*State Farm, supra,* 538 U.S. at p. 419; *Gore, supra,* 517 U.S. at p. 575.)  In assessing the reprehensibility of a defendant's conduct, we are to consider whether "[(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.]  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.  It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (*State Farm,* at p. 419.)

Independently assessing these factors in view of the evidence presented at trial, we must agree with the apparent findings of the jury and trial court that Union Carbide's culpability was so reprehensible as to warrant punitive damages to achieve the state's legitimate interest in deterring such conduct.

The first reprehensibility factor—whether the harm caused was physical as opposed to economic—clearly weighs in favor of high reprehensibility.  Due to his exposure to Union Carbide's asbestos, Mr. Izell has contracted a terminal cancer from which he will die in two to three years.  (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 561 (*Bullock II*) ["The harm caused by Philip Morris's misconduct was physical rather than economic because the evidence shows that Bullock suffered a debilitating and terminal illness, lung cancer, as a result of Philip Morris's fraudulent scheme"].)

31

With respect to the second factor, the evidence also shows Union Carbide acted with a reprehensible indifference to the health and safety of others. In 1967, Union Carbide produced an internal report concluding that low levels of exposure to asbestos cause mesothelioma, which can occur after only "a brief exposure, which may be as little as three months." Though acknowledging a "general inference that Crocidolite [asbestos] is more liable to produce mesothelioma," the report cautioned that "[e]xoneration of [Union Carbide's] Chrysotile [asbestos] has not been made" and "that on the basis of present evidence, we are not entitled under any circumstances to state that our material is not a health hazard." Echoing this concern, in 1968, Union Carbide's Associate Medical Director reported, "[i]t is generally held that much less exposure to asbestos increases the possibility of mesothelioma formation," and thus advised, "I don't see that we have any choice in a position except to admit that asbestos is carcinogenic under certain conditions." Despite these admonitions, Union Carbide chose not to warn its customers about the risk of cancer, stating in 1975, "cancer is a very emotional word and there is a strong possibility that people will react to it far beyond the real danger involved. . . . [¶] We cannot predict with certainty what effect the use of the proposed [cancer warning] will have on our business, but the general feeling here is that it is likely to vary somewhere between serious and fatal." All this suggests Union Carbide knew the dangers of its product, but failed to warn consumers of those dangers, while seeking to maintain profits from the sale of asbestos. (See *Stewart, supra,* 190 Cal.App.4th at pp. 34-35, 38 [reviewing same evidence and rejecting Union Carbide's assertion that punitive damages were unconstitutionally excessive because its conduct was on the "low end of the reprehensibility scale"].)

The same evidence also establishes reprehensibility with regard to the fourth and fifth factors—whether the conduct involved repeated actions, and whether the harm was the result of intentional malice, trickery, or deceit. Unquestionably, Union Carbide's continued sales of asbestos for more than decade after it internally recognized low levels

32

of exposure could cause mesothelioma establishes repeated conduct.[10] Further, as Union Carbide acknowledged, had it warned of the known risk of cancer, the result may have been "fatal" for its asbestos business, but it also likely would have prevented Mr. Izell from being exposed to its dangerous product. All told, four of the five factors weigh in favor of finding high reprehensibility.[11]

---

[10] Union Carbide also argues the $18 million punitive damage award is unconstitutional insofar as it was ostensibly based on Plaintiffs' counsel's suggestion that the jury award $1 million for every year that Union Carbide sold asbestos after learning of its dangers. Union Carbide contends this argument invited the jury to impermissibly punish Union Carbide for harm caused to others, because Mr. Izell was exposed to asbestos for only eight of the 18 years in question. Though due process does not permit courts or juries, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, this does not mean that the defendant's similar wrongful conduct toward others should not be considered in determining the amount of punitive damages. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690-691.) As our Supreme Court stated in *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, "[t]o consider the defendant's entire course of conduct in setting or reviewing a punitive damages award, even in an individual plaintiff's lawsuit, is not to punish the defendant for its conduct toward others. An enhanced punishment for recidivism does not directly punish the earlier offense; it is, rather, ' " 'a stiffened penalty for the last crime, which is considered to be an aggravated offense because a repetitive one.' " ' . . . By placing the defendant's conduct on one occasion into the context of a business practice or policy, an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature." (*Id.* at p. 1206, fn. 6.) Here, the jury, in fixing punitive damages based on the reprehensibility of Union Carbide's conduct, could properly consider the number of years Union Carbide sold asbestos after learning of its hazards, without impermissibly punishing the company for harm caused to others.

[11] The third reprehensibility factor, "whether . . . the target of the conduct had financial vulnerability" (*State Farm, supra*, 538 U.S. at p. 419), ordinarily is relevant only if financial vulnerability made the target more vulnerable to the defendant's wrongful conduct or exacerbated the harm, such as where the harm caused by the defendant's conduct was economic. (See *Gore, supra*, 517 U.S. at p. 576 ["infliction of economic injury, especially when done intentionally through affirmative acts of misconduct [citation] or when the target is financially vulnerable, can warrant a substantial penalty"], cited in *State Farm,* at p. 419.) As economic injury is not at issue here, this factor is not germane to our analysis.

33

(ii)     *Disparity between actual harm and punitive damages*

Due process requires that punitive damages bear a " 'reasonable relationship' " to the actual or potential harm to the plaintiff.  (*Gore, supra,* 517 U.S. at p. 580.)  Thus, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*State Farm, supra*, 538 U.S. at p. 426.)

The United States Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." (*Gore, supra,* 517 U.S. at p. 582; *State Farm, supra,* 538 U.S. at pp. 424-425.)  As *State Farm* explains, the due process limitation is elastic, rather than rigid, and depends on the circumstances: "[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citations.]  The converse is also true, however.  When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.  The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm,* at p. 425.)

In view of the "multimillion dollar" compensatory damage award for noneconomic losses, Union Carbide argues "any punitive award greater than [its] share of the compensatory award would be constitutionally excessive."  We disagree.

To begin, though Union Carbide's $3.9 million share of the reduced compensatory damage award may be substantial in the abstract, "we believe that whether the compensatory damages are 'small' or 'substantial' within the meaning of *State Farm, supra,* 538 U.S. at page 425, depends, in substantial part, on the defendant's financial condition." (*Bullock II, supra,* 198 Cal.App.4th at p. 565, fn. 11.)  This is because "the state's legitimate interests in punishment and deterrence are not served if the amount of punitive damages is so small relative to the defendant's wealth as to constitute only a nuisance or a routine cost of doing business (*Simon, supra,* 35 Cal.4th at p. 1185), and

34

because a punitive damages award violates due process only if the award is ' " 'grossly excessive' in relation to these interests" ' (*ibid.*, quoting *Gore, supra,* 517 U.S. at p. 568)." (*Bullock II,* at p. 565, fn. 11.)  Here, Union Carbide stipulated to a present net worth of $4.2 billion.  In view of its financial condition, and the highly reprehensible conduct discussed above, we cannot hold that punitive damages equal to less than five times Union Carbide's share of compensatory damages exceeded the amount necessary to serve the state's legitimate interest in punishment and deterrence.

Nor are we persuaded by Union Carbide's contention that a one-to-one ratio was mandated because the compensatory award here consisted entirely of noneconomic damages.  To be sure, some cases have recognized that a noneconomic award may be "high enough that it *appears* to include a punitive component," thereby reducing the permissible ratio of punitive to compensatory damages.  (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 90 (*Bankhead*), italics added; see also *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965, 974 [jury's award of substantial emotional distress damages, in the court's view, contained a "punitive element" so as to support only a one-to-one ratio].)  Here, however, we need not speculate from what "appears" to be included in a jury's verdict, because we have the trial court's thorough recitation of the harm suffered by Plaintiffs that it considered in setting the amount of compensatory damages.  The trial court's thoughtful analysis is set forth above in its entirety; there is no appearance that the court included a punitive component in the reduced compensatory award.

Finally, Union Carbide attempts to establish equivalency with *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, in which our Supreme Court concluded a one-to-one ratio between compensatory and punitive damages was the federal constitutional limit where the defendant's conduct involved a "*relatively low degree of reprehensibility*" and the compensatory verdict included a substantial award of noneconomic damages. (*Id.* at p. 719, italics added.) As we discussed with respect to the reprehensibility guidepost, that is not the case here.[12] (See *Stewart, supra,* 190 Cal.App.4th at p. 38.)

## DISPOSITION

The judgment is affirmed. Plaintiffs are entitled to their costs.

**CERTIFIED FOR PARTIAL PUBLICATION**

KLEIN, P. J.

I concur:

ALDRICH, J.

---

[12]     As for Union Carbide's policy arguments, we note they have been largely rejected by other courts (see *Bankhead, supra,* 205 Cal.App.4th at p. 88; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1668), and we have no cause to address them here. While considerations about the current leadership of Union Carbide and the volume of other asbestos litigation it faces might have been relevant to the jury or trial court in setting punitive damages, these issues are not among the guideposts that direct our constitutional mission "to find a level higher than which an award *may not* go." (*Simon, supra,* 35 Cal.4th at p. 1188.)

Kitching, J., Concurring and Dissenting.

I concur with my colleagues on all issues except the affirmance of the $18 million punitive damages award. On this issue, I respectfully dissent.

After determining "the jury clearly should have reached a different verdict or decision as to compensatory damages," and reducing the award by 80 percent—from $30 million to $6 million—the trial court declined to disturb the jury's $18 million punitive damages award, concluding a "3:1 ratio of punitive to compensatory damages is reasonable." In my view, the significant reduction of the jury's compensatory damage award requires a new trial on the amount of punitive damages.

"Although a trial court's approval of the punitive damage award (by denial of a motion for new trial) is entitled to significant weight [citation], deference is not abdication. It is the duty and responsibility of an appellate court to intervene where the award is so grossly disproportionate or palpably excessive as to raise a presumption that it was the product of passion and prejudice." (*Dumas v. Stocker* (1989) 213 Cal.App.3d 1262, 1266; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 (*Neal*) ["[A]n appellate court may reverse [a punitive damages] award 'only " '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " ' "].) "Appellate courts must scrutinize punitive damage verdicts because they 'constitute a windfall, create the anomaly of excessive compensation, and are therefore not favored in the law.' " (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1258.)

" '[E]xemplary damages must bear a reasonable relation to actual damages' [citation] even though no fixed ratio exists to determine the proper proportion." (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284 (*Liodas*).) In assessing whether a recovery is "grossly disproportionate," a "relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered

thereby is small." (*Neal, supra,* 21 Cal.3d at p. 928.) Because the calculation of punitive damages involves a fluid process that defies strict adherence to a rigid formula, the proper proportion that punitive damages should bear to compensatory damages is a question committed, in the first instance, to the jury's determination. (*Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 998; *Gagnon v. Continental Casualty Co.* (1989) 211 Cal.App.3d 1598, 1602 (*Gagnon*).) In view of these complimentary principles, when a substantial reduction in compensatory damages makes the proportionality of the jury's punitive award "suspect," appellate courts have held that the cause should be remanded for a new trial on the amount of punitive damages. (*Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1190 (*Auerbach*); see also *Liodas,* at p. 284 [holding, when a trial court has "granted a new trial on the issue of compensatory damages" "[e]xemplary damages must be redetermined as well," because " 'exemplary damages must bear a reasonable relation to actual damages' "].)

In *Frommoethelydo v. Fire Ins. Exch.* (1986) 42 Cal.3d 208, our Supreme Court reversed a $1,250,000 punitive damage award and held a new trial was required after reducing the compensatory damage award from $265,271 to $8,771. (*Id.* at pp. 211, 220.) The court explained that "[t]he award of punitive damages may not be upheld since most of the compensatory damages must be set aside." (*Id.* at p. 220.) Similarly, in *Auerbach,* the court remanded a $2.6 million punitive damage award after compensatory damages were reduced from $207,155 to $6,750. (*Auerbach, supra,* 74 Cal.App.4th at p. 1190.) Recognizing that "punitive damages must be proportional to recoverable compensatory damages," the *Auerbach* court concluded the substantial reduction in compensatory damages made the punitive damage award "suspect," because it indicated "the jury was misled about the amount of compensatory damages it could award." (*Ibid.* ["Because the punitive damages are out of proportion to the actual damages suffered by the Auerbachs, the punitive damage claim will have to be retried."].)

At the outset, I note two issues that militate against applying the customary degree of deference to the trial court's decision in this case. First is the fact that the court used the incorrect compensatory damage figure in determining a "3:1 ratio of punitive to compensatory damages is reasonable." As both parties agree, the court should have compared the punitive damage award to Union Carbide's 65 percent share of the compensatory damages ($3.9 million), which yields a ratio of 4.62 to 1. Second, in ruling on Union Carbide's new trial motion, the trial court was exclusively concerned with whether its reduction of the compensatory damages required it to make a corresponding reduction in punitive damages to preserve the jury's original ratio. In addressing this issue, the trial court correctly followed the rule stated in *McGee v. Tucoemas Federal Credit Union* (2007) 153 Cal.App.4th 1351—that "a reduction in compensatory damages does not mandate a corresponding reduction in punitive damages," as "[t]here is no requirement that the original ratio between compensatory and punitive damages as measured by the jury remain." (*Id.* at p. 1362.) However, by narrowly focusing on this issue, the trial court failed to consider whether its decision to reduce the jury's compensatory damage award by $24 million made the same jury's $18 million punitive damage award "suspect," and thereby subject to a new trial. (*Auerbach, supra,* 74 Cal.App.4th at p. 1190.)

In my view, the trial court's 80 percent reduction of the compensatory damages presents two possibilities with respect to the propriety of the jury's punitive damage award. One is that the jury acted with passion or prejudice, both in awarding $24 million more in compensatory damages than was supported by the evidence, and also in awarding punitive damages almost five times greater than the remitted amount of compensatory damages apportioned to Union Carbide. The other is that the jury followed the court's instruction and, in awarding punitive damages roughly equivalent to the amount of compensatory damages apportioned to Union Carbide, chose a number bearing a "reasonable relationship" to the harm the jury believed Plaintiffs suffered as a result of

3

Union Carbide's misconduct.[1]  If the first scenario is the case, Union Carbide was plainly entitled to a new trial.  However, even if the second scenario is accurate, this still makes the punitive damage award "suspect," because, as the trial court found here, the "jury was misled about the amount of compensatory damages it could award." (*Auerbach, supra,* 74 Cal.App.4th at p. 1190.)  In either event, given the trial court's significant reduction of the compensatory damage award, and the jury's crucial role in determining, without passion or prejudice, the "proper proportion punitive damages should bear to the injury suffered" (*Gagnon, supra,* 211 Cal.App.3d at p. 1602), I conclude punitive damages should be retried.

**CERTIFIED FOR PARTIAL PUBLICATION**


KITCHING, J.

---

[1]  The jury's original verdict apportioned 65 percent of the $30 million compensatory damage award to Union Carbide, or $19.5 million—slightly more than the $18 million punitive damage award.